**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JAMES G. RIGBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-2011-373-KD-M** |
| | ) | |
| **FIA CARD SERVICES, N.A., d/b/a** | ) | |
| **BANK OF AMERICA** | ) | ***FILED UNDER SEAL*** |
| | ) | |
| **Defendant.** | ) | |

**NARRATIVE STATEMENT OF UNDISPUTED FACTS AND LEGAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW, Plaintiff in the above referenced matter and provides this narrative statement of undisputed facts in support of Plaintiff's Motion for Partial Summary Judgment as follows:

**INTRODUCTION AND SUMMARY**

The Eleventh Circuit has determined that Rigby's allegations, if proven, establish a "billing error" in that he effectively cancelled his Grand Designs contract and he never received the membership benefits for which he was charged. The Court also held that Rigby properly alleged that FIA's failure to remove the charge in light of these facts was an Fair Credit Billing Act ("FCBA") violation. Each element of Rigby's FCBA claim are established by the undisputed facts. Rigby provided information to FIA which established both of these billing errors, including the fact that he had not receive the benefits he paid for. When a consumer claims not to have received the services purchased, the creditor is prohibited from denying the dispute unless it affirmatively determines that the services paid for were actually received. It is undisputed that FIA failed to make such a determination. In fact, FIA ultimately determined that Rigby had not received the benefits

and that the charge should be removed. It nevertheless permanently reinstated the charge. It did so solely because it lost the internal "arbitration" dispute with the merchant and passed that loss on to Rigby. This is an FCBA violation.

## STATEMENT OF UNDISPUTED FACTS

### A. The Rigbys Purchase Travel Club Membership

The Rigbys are married with grown children and they live in Pascagoula, Mississippi. Mr. Rigby is a welding inspector and Mrs. Rigby works at home. In April 2010, the Rigbys received a mailed solicitation offering $300 in Wal-Mart purchases if they attended a sale seminar in Gulf Shores. (See Deposition of Rhonda Rigby ("R. Depo."), excerpts of which are attached hereto as Exhibit 1, pp. 11-13). The Rigbys accepted the invitation and attended a sales presentation in Gulf Shores on May 1, 2010 by Grand Designs Travel, Inc. ("Grand Designs"). Grand Designs is a local company selling travel club memberships for Outrigger Travel Club ("Outrigger"), a company based in Oklahoma.

The Rigbys, along with other couples, sat through an hour-long presentation which described the travel club membership offered through Outrigger. During the presentation, the sales staff described deep discounts available on vacation packages. It was explained that Outrigger purchased the packages in bulk and passed along savings to its members. (R. Rigby Depo.(Ex. 1), pp. 15-19). Grand Designs also described condo rentals and cruises available to members at deep discounts, and the availability of a travel agent assigned to members to make arrangements. (Id. pp.18-20). Membership benefits were also to be fully available to "friends and family." (Id., p. 20). At least twice during the presentation, an attendee asked the presenter if the membership could be cancelled.

Each time the presenter indicated that it was, although he seemed "evasive" about the subject. (Id., pp. 54-56).

During the presentation, the Rigbys decided to purchase a membership for $4,995.00. (R.Rigby Depo.(Ex. 1), pp. 21-23). Mr. Rigby authorized the purchase through his Bank of America Visa credit card. Among the documents provided to the Rigbys when they purchased the membership at the presentation was a document entitled "Acknowledgments and By-Laws." That document, which was initialed by the Rigbys, states that they would receive a user name and password from Outrigger Vacation Club between 7 and 14 days after the purchase. (Contract Documents, attached as Exhibit 2, p. 2, ¶ 2). At the time they authorized the credit card charge, the Rigbys were provided no documents describing the benefits or limitations, nor were they informed of the limitations verbally. (R. Rigby Depo.(Ex. 1), pp. 42-43, 188-194). After they signed and initialed the contract documents, the Rigbys were handed a binder containing certain documents related to the membership. Grand Designs referred to the binder as the membership "kit". (Id., pp. 42-43). They were given "kit" only after they signed and authorized the credit card charge; they were escorted out of he building without any opportunity to read the documents in the "kit" while they were inside. (Id., p. 42). The "kit" also explained, for the first time, that in order to get the discounts on travel, members had to first book the trip and pay the full price. Only then would Outrigger later refund a portion the purchase price. (Id., pp. 46-47). The "kit" also explained that once a trip was booked, it could not be cancelled for any reason. (Id. pp. 46-47). The "kit" further explained that family benefits were only available to immediate family and, even then, the immediate family member had to use the member's credit card - the same credit card used to purchase the membership- for all expenses that were incurred as part of the trip. So, in order to allow an immediate family

member to use the benefit, the family member would have to take Mr. Rigby's credit card with them. (Id. pp. 47-48). None of this was explained during the presentation.

During the presentation Grand Designs explained that members were entitled to deep discounts and a large number of different hotels. The "kit" explained that there was only a handful of hotels listed that were eligible and none in the Rigbys' area. (Id. pp. 49-50).

**B. The Rigbys Rescind the Membership**

The Rigbys read through the "kit" immediately after they returned home. The next day they both decided that what they purchased was not what was explained to them in the presentation and they decided to cancel. (Id. p. 53). On May 2nd Mrs. Rigby called Grand Designs and explained to a company representative that they wished to rescind the purchase. The representative explained that Grand Designs does sometimes allow cancellations and instructed Mrs. Rigby to write a letter explaining why they wanted to rescind the membership. (Id. p. 58). That same day, the Rigbys faxed a letter to both companies explaining their desire to cancel the membership. (Id. pp. 57-59)(The cancellation letter is attached as Exhibit 3). The letter made clear that one of the reasons for cancelling was the fact that the fees and limitations on the benefits were not explained to them during the presentation. (Exhibit 3).[1] Mrs. Rigby followed the letter with phone calls to Grand Designs, but those calls were not returned. (R. Rigby Depo.(Ex. 1), pp. 59-60). After realizing that Grand Design was not going to refund their money, the Rigbys hired attorney Brandon Jones to write to Outrigger to request a refund. (Id. pp. 112-116). That letter is dated May 13, 2010. (A copy of that letter is

---

[1]When she wrote the letter, Mrs. Rigby was trying to be "diplomatic" so as to avoid offending the company that she was hoping would process the refund. This is why the letter states the program might be suitable for other people. (R. Rigby Depo.(Ex. 1), pp. 201-202).

attached hereto as Exhibit 4).

**C. Rigby's Dispute to FIA**

On the same day she wrote the cancellation letter to Grand Designs, Mrs. Rigby began calling Bank of America ("BOA")[2] to dispute the charge. (R. Rigby Depo.(Ex. 1), pp. 116-117). She was told that the charge had not appeared on her account and to call back, which she did. (Id. pp. 118-119). The Grand Designs charge first appeared on a FIA statement with a closing date of May 7, 2010. (See Exhibit 5). Mrs. Rigby had further discussions with FIA in May. According to FIA's internal records, the details regarding the dispute were received on May 25, 2010. FIA regards the dispute initiated on May 25th. (Deposition of Donald Robart, FIA's designated witness, ("Robart Depo."), excerpts of which are attached hereto as Exhibit 6, p. 37)(FIA Transactions Notes, excerpts attached as Exhibit 7, pp. 356-57).[3]

**D. FIA's Dispute Process**

Pursuant to FIA's dispute process, once a cardholder reports a problem with a transaction, FIA gathers all the information from the customer and makes a decision as to whether they can process a "charge-back." A "charge-back" is a reversal of the charge and retraction of the money sent to the merchant. The merchant then has the opportunity to rebut that decision, which is referred to as "re-presentment." At that point, FIA reviews the information provided by the merchant. If FIA determines that the charge should continue to remain off the consumer account, the merchant has

---

[2]Defendant FIA operates its credit card business under the trade name "Bank of America." (See Doc. 45). Bank of American, BOA and FIA are used interchangeably herein and all designate the Defendant.

[3]This is well before the 60-day deadline set out in the FCBA (15 U.S.C. § 1666(a)). FIA never considered the dispute untimely. (Robart Depo., (Ex. 6), p. 172).

the right to elevate the dispute to an "arbitration" process administered through VISA. (Robart Depo. (Ex. 6), pp. 25-26). (Robart Depo. (Ex. 6), pp. 25-26).[4] This is what happened here. As explained below, FIA ultimately determined that the charge should be reversed, and the matter was presented to VISA who sided with the Merchant. Based solely on VISA's decision, FIA placed the charge back on Rigby's card.

**E. FIA's Initial Review and Denial of the Rigby Dispute**

FIA's internal notes state that Mrs. Rigby explained on May 25th that they signed the membership agreement, but did not get the "entire packet about the membership" until after they signed the contract; and that after reading the packet they decided to cancel the membership. She also informed FIA about the cancellation letter and her attorney's letter to Grand Designs; and she faxed a copy of those letters and the Grand Designs contract papers to FIA on May 28. (FIA Transactions Notes (Ex. 7), pp. 356) (Robart Depo. (Ex. 6) pp. 37-39). ( Exhibit 8) (Robart Depo.).

On June 2nd, FIA wrote Rigby that it had "thoroughly reviewed the details of your dispute" and had determined that the charge should be re-billed to the account. (Exhibit 9). FIA initially coded the dispute as "cancellation," but denied under that code after initially determining that the contract could not be cancelled. (Robart Depo., (Ex. 6), pp. 54-55).[5] However, no one at FIA

---

4 The cardholder is not informed of this "arbitration" process, is not allowed to participate in the process and can not opt out. (Robart Depo., pp. 136-137; 170-171). VISA made its determination from review of the same information available to FIA. (Id. pp. 138, 145). VISA is a separate company from FIA Card Services (Id. pp. 139).

5 FIA uses several types of dispute codes to characterize and process each dispute. The codes include "cancelled" and "not as described." (Robart Depo, (Ex. 6), pp. 84, 179-186).

performed any research as to the legal validity of a non-cancellation clause in a consumer contract under Alabama law. (Id. p. 56).

**F. FIA Reconsiders**

Also on June 2nd, Ms. Rigby explained to FIA that the Rigbys cancelled the contract because they were never told prior to signing the contract that they would have to pay certain fees. Based on this information, FIA later "re-coded" the dispute as "not as described" and continued its investigation. This was June 9th. (Robart Depo., (Ex. 6), pp. 56-57); (FIA Transactions Notes (Ex. 7), pp. 351-354). FIA then requested Rigby to provide additional information regarding the fees paid in connection with the membership, which she did on June 9th. (Exhibit 10); (Id. p.60). From this point on FIA processed this as a "not as described" claim. (Id. p.119).

**G. Meantime, Grand Designs Fails to Activate Membership**

On June 4, 2010, Outrigger responded to the May 13th letter from the Rigbys' attorney (Ex. 4). In its letter, Outrigger made clear that it had received no record of membership purchased by the Rigbys and that Rigbys had no access to membership benefits. Outrigger stated that it has "no information related to your clients… We cannot comment on your client's issues ***because it would have been impossible for them to use the very services they claim to have an issue with.***" ( Exhibit 4). As stated, the Outrigger contract states that the membership would be processed and a username and password would be generated within 7 to 14 days from the purchase. (Ex. 2, p. 2, ¶ 2). The June 4th Outrigger letter confirms that the Rigbys needed this information to use the membership and that even a month after the purchase, they had yet to receive any of the benefits for which they paid. In other words, Grand Designs not only refused the Rigbys' cancellation request and kept the $4995, it also failed to process the Rigbys' membership.

Rigby faxed a copy of Outrigger's letter to FIA on June 11th. (Exhibit 12). That same day, Mrs. Rigby called FIA and relayed the Outrigger information by phone. (FIA Transactions Notes (Ex. 7), pp. 345-346). FIA's witness confirms that this information (that no benefits were received) was entered into its system and reviewed by FIA on June 14th. (Robart Depo., (Ex. 6), pp. 70- 71, 121).

**H. FIA Reverses its Decision**

On June 10th, after re-coding the dispute to "not as described," FIA reversed its initial denial and issued a credit to Rigby for the $4,995.00 Grand Designs charge. (Robart Depo., (Ex. 6), pp. 62-63) (FIA Transactions Notes (Ex. 7), p. 350). FIA mailed Rigby a letter to that effect on June 10th. (Exhibit 13). This decision was based Rigby's explanation that they never agreed to pay for the additional fees and that these fees were revealed only after they signed the contract. (FIA Transactions Notes (Ex. 7), p. 349); (Robart Depo., (Ex. 6), pp. 63-65). The letter describes this as "additional information," but this same information had provided in the Rigbys' cancellation letter which was provided to FIA back on May 25th. (FIA Transactions Notes (Ex. 7), pp. 356); (Robart Depo. (Ex. 6) pp. 37-38).

**I. FIA Reverses Its Decision (Again)**

On July 20th Grand Designs submitted its response to FIA's charge-back. Grand Designs claimed that the contract "is not subject to cancellation" and falsely stated that the Rigbys' membership was immediately activated through Outrigger and "still available for their use." (Exhibit 14); (Robart Depo., (Ex. 6), pp. 74-75). Based on Grand Designs' response and with no further investigation, FIA reversed again and re-billed the $4,995 charge to Rigby's account. (Robart Depo., (Ex. 6), pp. 77-78); (FIA Transactions Notes (Ex. 7), p.348). FIA decided to reject the dispute,

despite having received the June 4th Outrigger letter which confirms that the services the Rigbys purchased were not delivered. This fact was known to FIA since June 14th. (Robart Depo., (Ex. 6), pp. 70-71, 121). However, FIA took no steps to determine that whether the services Rigby paid for were actually received. (Robart Depo., (Ex. 6), pp. 76-77 ). FIA's decision to reinstate the charge was premised on a finding that "the merchant supplied signed contract disclosing no cancel" and that the "cardholder has nothing to support [her claim] that she wouldn't have to pay anything when booking her vacation. . .." (FIA Transactions Notes (Ex. 7), p. 341). This simply mirrors the unsupported statements in Grand Designs' response. FIA had already received the same signed contract from Rigbys back in May, had noted the non-cancellation clause and, with that *same information,* decided back on June 10th to remove the charge from the account. (Exhibit 13); (Robart Depo., (Ex. 6), pp. 85-86). In fact, FIA's notes dated June 10th state that the contract "does not state anywhere. . .that [Rigby] would be responsible for fees upon booking." (FIA Transactions Notes (Ex. 7), p. 349). It is undisputed that Grand Designs' response did not provide any valid basis for reversing that conclusion. FIA's testifying representative agreed that the contract does not disclose additional booking fees and that Grand Designs failed to provide any proof that the additional fees mentioned in Rigby's cancellation letter were disclosed prior to the signing of the contract. (Robart Depo., (Ex. 6), pp. 96-97). Nevertheless, on July 21st FIA wrote Rigby a letter informing him of its decision to deny his dispute. (Exhibit 15).

**J. Rigby Returns the "Kit" to Grand Designs**

In its discussions with Mrs. Rigby, FIA suggested that she return the "kit" to Grand Designs. (R. Rigby Depo.(Ex. 1), pp. 161-162). On July 30th she drove to Gulf Shores and personally delivered the "kit" to a Grand Designs employee named Kyle. Kyle confirmed with her that the

Rigbys were not able to use any of the benefits because she had not been provided a membership card or number. He explained that they had "dropped the ball on this." (R. Rigby Depo.(Ex. 1), pp. 158-159). He asked her to write another rescission explanation which she did. (Id., pp. 148-162)(Exhibit 16).

**K. FIA Reverses (Again)**

In early August, the Rigbys received the July 28th FIA denial letter. Mrs. Rigby then called FIA to point out (again) that they had never received any benefits and that this fact was confirmed by Outrigger's June 4th letter. This information is reflected in FIA's internal notes. (FIA Transactions Notes (Ex. 7), pp. 338 – 339); (Robart Depo., (Ex. 6), pp.107 – 108). Mrs. Rigby followed this conversation with a letter to FIA dated August 3rd which counters each point of the merchant's "re-presentment." (Exhibit 17). The letter also states that although they paid the price for the membership, they had not received anything from Grand Designs or Outrigger. (Id.). As stated, FIA had received and reviewed this same information back on June 9th. In her August 3rd letter, Rigby also described her July 30th trip to Grand Designs and her discussions with Kyle. (Id).

Based on the information provided in this letter, FIA reversed its decision and removed the $4,995 charge from Mr. Rigby's account once again. (Robart Depo., (Ex. 6), p. 113). FIA communicated this decision by letter dated August 12th. (Exhibit 18). As reflected in FIA's internal notes and confirmed by FIA's witness, this decision was based on a determination that the Rigbys' did not receive the membership benefits because the merchant had not sent the membership information to Outrigger. (Robart Depo., (Ex. 6), pp.113-114, 118); (FIA Transactions Notes (Ex. 7), p. 330). However, this very same information had been available to FIA since June 9th.

**L. And Again - for Its Final Denial**

The next notice received by Rigby was the FIA letter dated November 1, 2010, explaining its final decision to deny the dispute and reinstate the $4,995 charge. FIA stated that after "thoroughly reviewing the details of your dispute, and based on the information we received, we are unable to pursue your dispute further. Unfortunately, we did not receive specific documentation that states what you were supposed to receive and how it was different from what you did receive." (Exhibit 19). The letter explained that FIA considered the matter resolved and reminded Mr. Rigby that he must pay the $4,995 charge to avoid any penalty. (Id.). FIA took no further action regarding the dispute except to explain to Mrs. Rigby over the phone that it was reinstating the charge because VISA ruled in the merchant's favor. (Robart Depo., (Ex. 6), pp. 156-157).[6]

Unbeknownst to the Rigbys, this decision was the result of an "arbitration" decision by VISA after review of information provided by FIA and Grand Designs. According to FIA, this process is the result of the continuing dispute between FIA and Grand Designs over whether the charge should remain on the Rigby account. (Robart Depo., (Ex. 6), pp. 25-26, 117-118). In fact, the "arbitration" was initiated after FIA determined that charge should not be reinstated on Rigby's bill. This is reflected in the information FIA provided to VISA which included the FIA statement that "[t]he reason customer cancelled was because merchant didn't provide what was promised..." (Exhibit 20); (Robart Depo., (Ex. 6), pp. 117-118). FIA's internal notes also reflect its finding that Grand Designs' rebuttal was inadequate and that the Rigbys never received the membership benefits:

> Customer cancel [sic] the travel services due to non reduced service rate, no membership card received, the "kit" was returned to rep at merchant location,

[6]FIA did later respond to a complaint the Rigbys filed with the OCC, but that had no bearing on its final decision.

> customer has not been able to use the membership. . . merchant rebuttal only addressed the cancellation policy does not address the true nature of the disputes.

(FIA Transactions Notes (Ex. 7), pp. 324-26). This is the position which FIA submitted to VISA in the arbitration. (Robart Depo., (Ex. 6), pp. 139-140). VISA, after reviewing the same documents and information available to FIA, nevertheless determined that the charge should be reinstated. VISA did not address FIA's position that no membership benefits were received. (Robart Depo., (Ex. 6), pp. 147-148). Relying solely on VISA's determination and without making any further determination or reviewing any additional information, FIA reinstated the charge. (Robart Depo., (Ex. 6), pp. 152-157).

**M. Scope of FIA's Investigation**

FIA's investigation included a review of all the documents and information submitted by Rigby and the "re-resentment" information from Grand Designs. However, FIA did not contact either Grand Designs, Outrigger or any other entity. FIA made no determination that Rigby actually received the services for which he was charged. (Robart Depo., (Ex. 6), pp. 152-156). In fact, as stated above, the FIA notes indicate the opposite: that it determined that the services *had not been* delivered timely and that the merchant's response did not adequately address the failure to deliver the services paid for. (FIA Transactions Notes (Ex. 7), pp. 324-26).

## <u>LEGAL MEMORANDUM</u>

**A. The Fair Credit Billing Act**

The FCBA was enacted in 1974 in order "to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); Pub. L.No. 93-495, 88 Stat. 1500

(Oct. 28, 1974). The FCBA was added as "Part D" of the Truth in Lending Act ("TILA") and is codified at 15 U.S.C. § 1666 - 1666j. Courts in this Circuit emphasize "the strong remedial purpose of TILA," and have heeded "continual admonitions that we construe TILA ... liberally in the consumer's favor." Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1068 (11th Cir.2004); see also McGowan v. King, Inc., 569 F.2d 845, 848 (5th Cir.1978) ("The scheme of the statute is to create a system of private attorneys general to aid its enforcement, and its language should be construed liberally in light of its remedial purpose."); see also Squires v. BAC Home Loans Servicing, LP, 2011 WL 5966948 (S.D. Ala. Nov. 29, 2011)(term "creditor" to be construed broadly in light of remedial purpose of TILA). The FCBA, like the rest of TILA, is remedial in nature and entitled to broad construction in favor of the consumer. "Congress enacted the TILA and FCBA to protect consumers from inaccurate, unfair, and predatory credit practices, and that '[c]onsistent with its purpose, the statute is meant to be construed liberally in favor of the consumer.'" Eicken v. USAA Fed. Sav. Bank, 498 F. Supp. 2d 954, 967-68 (S.D. Tex. 2007) quoting Fairley v. Turan-Foley Imports, Inc., 65 F.3d 475, 479 (5th Cir.1995).

In its reversal of this Court's dismissal of this action, the Eleventh Circuit aptly summarized the FCBA as follows:

> Enforced as part of the Truth and Lending Act, and implemented by Regulation Z, the FCBA gives a consumer the right, upon proper written notice, to request correction of "billing errors" by its creditors. *See* 15 U.S.C. § 1666; 12 C.F.R. § § 226.1–226.36. Under the FCBA, a consumer who believes there is a billing error on his statement has sixty days, from receiving the statement, to notify the creditor of that error. *See* 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(b). If the consumer gives proper and timely notice, then the creditor is required to provide, within thirty days, written acknowledgment that it received the notice; and, within ninety days, or two complete billing cycles, whichever is shorter, the creditor must investigate the matter, either correcting the billing error or sending a written explanation of why the original statement was correct. 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(c), (e), (f).

Rigby v. FIA Card Servs., N.A., 490 F. App'x 230, 234-35 (11th Cir. 2012); see also, Am. Exp. Co. v. Koerner, 452 U.S. 233, 234-37 (1981). In order to recover on an FCBA claim, a plaintiff must prove the following: (1) the existence of a billing error; (2) plaintiff's timely notification of the billing error; and (3) failure of the card issuer to comply with the procedural requirements of Section 1666. Rigby, 490 F. App'x at 234-35; Cunningham v. Bank One, 487 F. Supp. 2d 1189, 1191-92 (W.D. Wash. 2007); Beaumont v. Citibank (South Dakota) N.A, 2002 WL 483431, (S.D.N.Y. March 28, 2002).

**B. Each Element of Rigby's FCBA Claim is Established By the Undisputed Facts.**

**1. The Existence of a Billing Error**

"Billing Error" is defined at 15 U.S.C. § 1666(b) and describes various types of disputes which constitute a "billing error." Again, the Eleventh Circuit's opinion in this case succinctly describes the pertinent aspects of this definition:

> The statute defines a "billing error" as, among other things, "[a] reflection on a statement of goods and services ***not accepted*** by the obligor or his designee or ***not delivered*** to the obligor or his designee in accordance with the agreement made at the time of the transaction." 15 U.S.C. § 1666(b)(3). The commentary on the implementing regulations, to which we generally defer, *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980), places an additional restriction on this type of billing error claim, clarifying that § 1666(b)(3) "does not apply to a dispute relating to the quality of property or services that the consumer accepts." 12 C.F.R. § 226.13, Supp. I. C. 13(a)(3)(1)(ii). Under the regulations, "[w]hether acceptance occurred is determined by state or other applicable law." 12 C.F.R. § 226.13, Supp. I. cmt. 13(a)(3)(1)(ii). In this case, then, Alabama law dictates whether acceptance of the membership occurred. *See* Ala. Code § 7–2–606 (1975) (outlining the ways in which "acceptance" of goods occurs).

Rigby, 490 F. App'x at 234. (emphasis added).

There exist two "billing errors" in this case: (1) The services were not "accepted" by Rigby

because his attempted cancellation of the contract constitutes "non-acceptance" under Alabama law; and (2) The services were not delivered because, even though it kept Rigby's money, Grand Designs did not provide information to Outrigger such that the Rigbys could use the membership benefits. Each of these is addressed separately below.

**a. Services Not Accepted**

The Rigby Court explained that although Rigby's transaction involved primarily services rather than goods, the UCC's definition of "acceptance" is the proper guidepost.

> The membership, as set forth in the Contract's "description of goods and services," comprises both goods and services, but appears to be predominantly composed of services. As a result, the question of whether "acceptance" of the membership occurred is not resolved by direct resort to Alabama's commercial code. See Skelton v. Druid City Hosp. Bd., 459 So.2d 818, 825 (Ala.1984) (Torbert, C.J., concurring) (stating that an agreement that is predominantly for services is not governed by the U.C.C., while one predominantly for goods is). Nevertheless, we follow Alabama's courts in looking to the commercial code for guidance when deciding a dispute involving a "hybrid sale/service transaction" such as this. Id. at 823–24 (holding that the U.C.C. provision relating to implied warranty of merchantibility can apply to warranty claim relating to hernia surgery).

Rigby, 490 F. App'x at 234.

Under the UCC, "acceptance" occurs when the buyer "[a]fter a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he will take or retain them in spite of their noncomformity"). Ala. Code § 7-2-606(1)(a)(1975); Rigby, 490 F. App'x at 235. Also, a buyer has the right to reject goods whose quality do not conform to the contract, if the rejection occurs within a reasonable time. Ala. Code §§ 7-2-601 & 602 (1975). It is also well-settled in Alabama that a buyer may rescind any contract where the assent was induced by fraud, as long as notice of the rescission is prompt and unreserved. S. Bldg. & Loan Ass'n v. Argo, 141 So. 545, 546-47 (Ala. 1932); Day v. Broyles,133 So. 269 (Ala. 1931).

The Court of Appeals held that Rigby's allegations that his wife delivered a written cancellation request to Grand Designs the day after the purchase, if proven, constitute "nonacceptance" under Alabama law:

> Rigby alleged that, the day after having the opportunity to inspect the complete terms of the vacation club membership in the Membership Kit, his wife tried to cancel the purchase of the membership. At the pleadings stage, we accept these facts as true, and as such, they constitute nonacceptance of the vacation club membership under Alabama law. *See* Ala.Code § 7–2–606(a) (allowing that acceptance of goods occurs when a buyer "[a]fter a reasonable opportunity to inspect the goods, signifies to the seller that the goods are conforming or that he will take or retain them in spite of their noncomformity").

Rigby, 490 F. App'x at 235.

These facts are established by the undisputed record. The limitations and fees were not disclosed with the "kit." Those limitations also contradicted statements made in the presentation regarding the benefits. These fees and limitations were important to the Rigbys and they cancelled immediately after learning the truth about the membership they had purchased. The cancellation letter was faxed the day after the purchase. (R. Rigby Depo.(Ex. 1), pp. 53, 57-60). Also, as soon as it was apparent that Grand Designs was not going to process the refund, the Rigbys had their lawyer write another request for refund to Grand Designs and Outrigger. (Id., pp. 112-116)(Exhibit 4).

Pursuant to the plain language of Section 1666(b)(3), as well as the law of the case, these facts establish a "billing error" for non-acceptance of the membership services. Rigby, 490 F. App'x at 235. As explained above, all of these facts were provided to FIA at the beginning of the dispute process.

**b. Services Not Delivered**

The Rigby Court also determined that the facts alleged by Rigby constituted a "billing error" because the services purchased "were not delivered to the obligor or his designee in accordance with the agreement made at the time of [the] transaction." 15 U.S.C. § 1666(b)(3).

> Beyond [the cancellation], Rigby pleaded sufficient facts to show that the membership was "not delivered ... in accordance with the agreement made at the time of the transaction." 15 U.S.C. § 1666(b)(3). According to the facts alleged, Rigby attempted to cancel the purchase. Grand Designs declined to cancel the agreement and kept the $4,995.00. But at the same time that Grand Designs was telling Rigby that he could not cancel the agreement, it did not perform. Rigby never received the username and password that provided the only way to access the membership benefits of the vacation club. Thus, taken as true, Rigby's factual allegations establish that Outrigger never "delivered" his membership.

Rigby v. FIA Card Servs., N.A., 490 F. App'x 230, 235 (11th Cir. 2012)

The non-delivery of the membership services is also established by the undisputed record. The contract provides that members would receive a user name and password from Outrigger between 7 and 14 days after the purchase. (Exhibit 2). Over thirty days after Grand Designs collected Rigby's $4,995, Outrigger confirmed that it had never heard of the Rigbys and it would be "impossible" for the Rigbys to receive the membership benefits. (Exhibit 4). Rigby promptly notified FIA after receiving Outrigger June 4th letter and provided that letter to FIA. It is undisputed that by June 14th, FIA had received and reviewed that information. (FIA Transactions Notes (Ex. 7), pp. 345- 346) (Robart Depo., (Ex. 6), pp. 70-71, 121). The record establishes a "billing error" for non-delivery of goods.

**2. Timely Notification of the Billing Error**

A consumer dispute must be received by the creditor within sixty days of the date of the statement on which the disputed charge first appears. 15 U.S.C. §1666(a). The Grand Designs

charge first appeared on a FIA statement with a closing date of May 7, 2010. (See Exhibit 5). FIA's records reflect that Mr. Rigby's dispute was received and initiated on May 25th. (Robart Depo., (Ex. 6), p. 37). All of the information provided by Rigby, including the June 4th Outrigger statement that no membership benefits had been delivered, was received by FIA by June 14th. (FIA Transactions Notes (Ex. 7), pp. 345-346); (Robart Depo., (Ex. 6), pp. 70-71, 121). Therefore, the dispute and all information submitted in support of the dispute was submitted to FIA within the sixty-day period. FIA never considered the dispute untimely and this was not a basis for its ultimate decision to reinstate the charge. (Robart Depo., (Ex. 6), p. 172).

**3. FIA Failed to Follow the Procedural Requirements of Section 1666**

The FCBA sets out several requirements which must be met upon receipt of notice of a billing error. Among other requirements, the creditor must, within two billing cycles after receipt of the dispute or ninety-days, whichever is shorter, reasonably investigate the matter, either correcting the billing error or sending a written explanation of why the original statement was correct. 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(c), (e), (f). Moreover, with respect to a consumer's claim that no goods or services were received, the Official Commentary imposes an additional requirement.

> Nondelivery of property or services.
> In conducting an investigation of a billing error notice alleging the nondelivery of property or services under § 226.13(a)(3), **the creditor shall not deny the assertion unless it conducts a reasonable investigation and determines that the property or services were actually delivered, mailed, or sent as agreed**.

12 C.F.R. 226 Official Commentary, § 226.13(f)(3)(ii)(emphasis added); <u>see</u> <u>also</u> <u>Rigby</u>, 490 F. App'x at 235.

Rigby provided FIA clear notice of two billing errors. In investigating the claim, FIA

reviewed of all the documents and information submitted by the Rigbys and the information from Grand Designs. It did not contact either Grand Designs or Outrigger. Upon review of this information, it decided (twice) that the charge was due to be removed. Most importantly, at no time did FIA determine that the membership services "were actually delivered." (Robart Depo., (Ex. 6), pp. 76-77 ). In fact, FIA's final determination was that the services were *not* provided. It also concluded that the merchant's response "did not adequately address the failure to deliver the services paid for." (FIA Transactions Notes (Ex. 7), pp. 325-26).

Once a creditor determines that a "billing error" occurred, it is required under the FCBA to permanently remove the charge from the account.

> *Procedures if billing error occurred as asserted.* If a creditor determines that a billing error occurred as asserted, it shall within the time limits in paragraph (c)(2) of this section: (1) Correct the billing error and credit the consumer's account with any disputed amount and related finance or other charges, as applicable; and (2) Mail or deliver a correction notice to the consumer.

12 C.F.R. § 1026.13(e).

Even though it found that the services were not provided and that the merchant's response was inadequate, FIA's final decision was to place the charge back on the account. It did this not because it changed its determination. FIA denied the dispute solely because of the VISA ruling in the internal arbitration dispute with and the merchant. FIA effectively passed along to Rigby the consequences of VISA's decision, even though FIA determined that Rigby should retain the credit.

This is an FCBA violation. There is nothing in the FCBA or Reg Z which allows a creditor to escape its statutory obligation to reasonably investigate a dispute and correct billing errors simply because of a decision made by a separate entity (VISA). The bottom line is that FIA made no determination that the billing errors did not occur; and it certainly made no determination that Rigby

received what he paid for. Under the clear edicts of the FCBA, FIA was required to remove the Grand Designs charge and all associated charges from Rigby's account.

## CONCLUSION

Because the undisputed facts establish FIA's liability under the FCBA, Rigby is entitled to a judgment as a matter of law on this issue.

\s\Kenneth J. Riemer
KENNETH J. RIEMER
Attorney for Plaintiff
UNDERWOOD & RIEMER, PC
166 Government Street
Mobile, AL 36602
(251) 432-9212
(251) 990-5558 (fax)
kjr@alaconsumerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2013, I electronically filed the foregoing with the Clerk of the Court UNDER SEAL using the CM/ECF system, which will send notification of such filing to the counsel of record. A copy has also been e-mailed to counsel of record.

\s\Kenneth J. Riemer
KENNETH J. RIEMER