# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| JAMES G. RIGBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV-2011-373-KD-M |
| | ) | |
| FIA CARD SERVICES, N.A., d/b/a | ) | |
| BANK OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF DEFENDANT FIA CARD SERVICES, N.A., IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant FIA Card Services, N.A. ("FIA"), respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## I. STATEMENT OF THE CASE

FIA should be granted summary judgment on all of Plaintiff's claims because there is no genuine dispute that FIA timely responded to, investigated, and resolved Plaintiff's billing dispute with Grand Design Travel ("Grand Design) involving an Outrigger Vacation Club ("Outrigger") membership in accordance with the procedural requirements of the Fair Credit Billing Act. 15 U.S.C. §1666

("FCBA"). Thus, Plaintiff's FCBA (Count I), Negligence Per Se (Count III) and Wontoness (Count IV) claims should all be dismissed with prejudice.[1]

As set forth in greater detail below, FIA acknowledged receipt of Plaintiff's billing dispute within 30 days, as required under the FCBA. 15 U.S.C. §1666(a). FIA also investigated the claim, determined that no "billing error" had occurred, and sent Plaintiff letters explaining its conclusion within two complete billing cycles. Thus, FIA timely complied with the FCBA's requirements for acknowledgment, investigation and resolution of Plaintiff's purported billing errors. Moreover, even though FIA had no obligation to respond to Plaintiff's reassertion of his claim, FIA went the extra mile and for the next three months pursued Grand Design, on behalf of Plaintiff, for a refund under the Visa® credit card association rules ("Visa® rules"), taking the process as far as it could go. Ultimately, Visa® ruled in favor of Grand Design, but Plaintiff blames this result on FIA and improperly characterizes it as an FCBA violation.

Plaintiff also took his dispute to the Office of the Comptroller of Currency ("OCC"), which is empowered to take supervisory actions against national banks "that do not comply with laws and regulations or that otherwise engage in unsound

---

[1] Plaintiff withdrew Count II for Declaratory Relief in the early stages of this case. (*See* Docket Entry ("D.E.") 16 at 9.)

practices."[2]   Notably, the OCC's investigation of Plaintiff's claim resulted in no regulatory action against FIA and no finding that FIA failed to comply with laws and regulations or otherwise engaged in unsound practices.

Finally, FIA's undisputed compliance with the FCBA's procedural requirements is fatal to Plaintiff's state law claims of negligence and wantonness. FIA should therefore be granted summary judgment on all claims.

## II.  FIA'S STATEMENT OF UNDISPUTED FACTS

### A.    THE GRAND DESIGN TRANSACTION.

1.    On May 1, 2010, Plaintiff James Rigby and his wife ("the Rigbys"), Mississippi residents, attended a presentation by Grand Design for an Outrigger membership in Gulf Shores, Alabama.  (Deposition of Rhonda Rigby ("RR Dep.") 10:23-11:6, 16:3-7, Ex. A.)[3]

2.    Plaintiff decided to purchase an Outrigger membership for $4,995.00.  (RR Dep. 21:10-24:5, Ex. A.)   To complete the purchase, the Rigbys signed and initialed:  (1) Acknowledgment and By-laws ("By-Laws") (Ex. B) and (2) Retail Installment Contract. (Ex. C.)   Mr. Rigby also signed a credit card receipt and statement authorizing the $4,995.00 charge for the membership to be placed on his

---

[2] *See* http://www.occ.gov/about/what-we-do/mission/index-about.html (last visited June 21, 2013).

[3]  For purposes of this Memorandum, all references to "Exhibits" refer to the exhibits attached to FIA's Evidentiary Submission (D.E. 84), unless otherwise indicated.

Visa® credit card and agreeing to pay it.  (Deposition of James Rigby ("JR Dep.")
33:5-34:8, Ex. D; Ex. E.)

3.    As to the By-Laws, Plaintiff admits to having "glanced over it very quickly"
and "probably didn't pay attention to every I that was dotted and T that was
crossed."  (JR Dep. 13:13 - 14:9-20, Ex. D.)  Plaintiff was "sure" he read the Retail
Installment Contract before he signed and initialed it, but did not recall reading the
"Description of Goods and Services" portion of the Retail Installment Contract
which stated:

> **Membership** in a vacation club which includes stays in participating
> condominiums, discounts and other membership benefits as explained
> more fully in the membership kit document.

(*Id*. at 22:4-23:9, Ex. D.)   Plaintiff read the bolded, capitalized and encircled
portion of the Retail Installment Contract that stated:

> **DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT ….
> THIS TRANSACTION IS TAKING PLACE AT OUR MAIN
> OR PERMANENT BRANCH OFFICE OR LOCAL ADDRESS
> AND IS, THEREFORE, NOT SUBJECT TO CANCELLATION
> OR RESCISSION UNDER STATE AND FEDERAL LAW
> ONCE IT IS SIGNED AND RECEIVED BY BUYER.**"

(*Id*. at 24:2-22, Ex. D; Ex. C.)  Mrs. Rigby "didn't really get to look at the contract
a whole lot" but she put her "trust" in Plaintiff to understand its terms.  (RR Dep.
36:2-3, 37:4-5, Ex. A.)

4.    Grand Design provided the Rigbys with copies of the documents they signed
along with the Kit, a black zip-up binder with interior pockets containing "gifts"

from Grand Design and colorful pages along with Outrigger's contact and website information (RR Dep. 50:21-52:3, Ex. A.), as well as detailed information regarding the vacation club services.  (*See* Ex. F.)

5.    The Rigbys reviewed the Kit when they got home and thinking they might have "made a mistake," "they immediately regretted" their decision and decided to "try to get [their] money back,"   (RR Dep. 55:22-53:12, Ex. A; *see also* Ex. G.) The next day, Mrs. Rigby telephoned Grand Design to request cancellation and was instructed to fax a letter to Grand Design and Outrigger.  (RR Dep. 56:19-59:23, Ex. A.)  On May 2, 2010, the Rigbys faxed the letter stating:

> Dear Sirs;
>
> Yesterday we attended one of your presentations at Grand Design Travel in Gulf Shores, Alabama.  We were very impressed with the vacation club membership that was offered to us and through that this would be advantageous to us in our future travels and *joined in full*. However, after receiving the package and reviewing the information we realize that although this club would be wonderful for many of our friends and others, it would not be beneficial to us. Several of the fees attached to this program were not covered in the presentation and the full view of what exactly what was included was only revealed in the portfolio after we had purchased the membership so we did not know the limitations and/or inclusions.
> … We have not used the membership and *are not dissatisfied with the promises of this program*; however, the condominium clean up fees and other added charges make this a program that would have to be used more than our lives allow for it to be beneficial to us. Also, most of the packages are only a good buy if you figure airline tickets into the deal and we generally prefer to drive on our vacations and 'see" the sights along the way.  …  Although the savings on hotel stays are beneficial, they are limited as to the cities included – *Mississippi, our home state, has listed only seven*.  Louisiana only

has ten. *All in all, the program is great for some people, but is not really a program that we should be invested in for our future.*  We would appreciate your co-operation in this process and await your response.[4]

(Ex. H) (emphasis added.)

6.      The Rigbys did not return the Kit to Grand Design until July 30, 2010, nearly three months after their purchase.  (RR Dep. 155:3-156:13, Ex. A; *see also* Ex. I.)  They did not make a copy of the Kit's contents.  (RR Dep. 52:1-3, Ex. A.)

## B.      FIA'S TIMELY INVESTIGATION OF PLAINTIFF'S DISPUTE.

7.      On May 28, 2010, the Rigbys disputed the Grand Design charge in writing to FIA and submitted: (a) a letter from Barton Law Firm to Outrigger; (b) a copy of the Rigby's May 2 letter to Outrigger; (c) the Membership Application; (d) the By-Laws, and (e) the Retail Installment Contract.  (Ex. J.)  Plaintiff's billing dispute was timely presented to FIA during the account statement period of May 8 to June 8, 2010.  (Ex. K.)

8.      On June 1, 2010, FIA sent a letter to Plaintiff, acknowledging receipt of the billing dispute with Grand Design.  (Ex. N.)  After reviewing Plaintiff's dispute and observing that the contract the Rigbys signed contained a non-cancellation provision, FIA determined that it could not credit Plaintiff's account.  (Deposition of Don Robart ("FIA Dep.") 42:16-43-6; 46:6-14, Ex O.)  FIA sent Plaintiff a letter

---

[4] Three years later, Plaintiff distances himself from statements about the suitability of the program for others by characterizing it as diplomacy designed to sweeten his chance for a refund, a position he never took in the dispute process.

dated June 2, advising that it could not assist him because FIA "cannot intervene in situations involving a merchant's return, refund, or cancellation policy."  (Ex. P.) On that date, FIA considered the "dispute resolved" and the balance owed.  *Id*. The June 2 letter was sent within 30 days of FIA's receipt of Plaintiff's faxed billing dispute on May 28.

9.     On June 2, 2010, FIA also contacted the Rigbys telephonically to explain its decision, whereupon the Rigbys claimed that they were never told they would have to pay booking and usage fees.  At that point, FIA opened a claim file in order to assist the Rigbys with a chargeback under a "not as described" code.  (FIA Dep. 46:15-47:1; 49:15-50:1, Ex. O.)

10.     FIA commenced the chargeback on June 10 and sent Plaintiff a letter that day confirming receipt of the additional information.  (Exs. Q & R.)  In that letter, FIA reminded Plaintiff that *"[a]s stated in our previous letter, after completing a reasonable investigation of your dispute based on the information we had at the time*, <u>*we were unable to determine that a*</u> <u>*billing error*</u> *occurred, and as such, your dispute was resolved*."  (Ex. R) (emphasis added.)  Thus, FIA had already concluded that no billing error had occurred and communicated that decision in writing within 30 days of FIA's receipt of Plaintiff's billing dispute.  FIA also advised that it issued a credit to the account, and explained that if unable to maintain it, the account would be debited "as the merchant(s) has the opportunity

to present new information to support why they feel the transaction(s) is valid." (Ex. R.)  FIA "contacted the merchant(s) on [Plaintiff's] behalf to present [his] dispute(s) to them."  (*Id*.)

11.    Under Regulation Z, 12 C.F.R. § 226.13, FIA is not required to make a credibility determination.  (FIA Dep. 182:5-25, Ex. O.)  Further, under Regulation Z, "everybody met their time frames" for presentation of the dispute by Plaintiff and resolution by FIA.[5]  (FIA Dep. 181:6-18, Ex. O.)

## C.    THE VISA® CHARGEBACK PROCESS[6]

12.    FIA's Credit Claims Senior Operations Manager, Don Robart, described the chargeback process and the steps taken to assist Plaintiff in his attempt to procure a refund from Grand Design.  (FIA Dep. 62:17-65:19, Ex. O.)  FIA is neither judge nor jury in the chargeback process and its role is that of being there "to help the customer along the way."  (*Id*., 134:20-135:3.)

---

[5]  FIA did not contact Grand Design directly before undertaking the chargeback because the merchant has 45 days to respond to it, and if it fails to respond, "the issuer automatically wins" -- so does the cardholder.  Alerting the merchant puts the bank at a disadvantage because the merchant will be looking for the chargeback before it processes.  Without the alert, there is a chance that the merchant will miss the deadline to respond.  Thus, alerting the merchant in certain circumstances can be a disadvantage to the cardholder.  (*See* FIA Dep. 174:18-176:5, Ex. O.)

[6]  The Visa chargeback cycle is succinctly illustrated at http://usa.visa.com/ download/merchants/chargeback-management-guidelines-for-visa-merchants.pdf at p.12 (last visited June 21, 2013).

13.   Visa® rules govern whether funds that are the subject of a credit card dispute may be removed from a merchant account.  (*Id.*, 83:4-8.)  When a cardholder contacts FIA with a dispute in the "first chargeback stage," FIA's Credit Claims group gathers the information provided and determines whether a refund can be processed with the merchant under the Visa® rules.  (*Id.*, 25:8-12.) If so, the customer's account is credited and the Visa® rules allow the money to be removed from the merchant's account.  (*Id.*, 25:12-14.)

14.   A chargeback is "coded" with terms used in the Visa ® rules.  (*Id.*, 47:10-20; 50:3-23; 52:5-20.)  Once a chargeback is processed through a specific code, such as "services not as described," however, the claim cannot continue to be processed later under a different code such as "services not received" especially where, as here, the cardholder was in receipt of something, namely, a Kit, membership application and signed forms.  (*Id.*, 118:4-120:15.)[7]

15.   The merchant has an opportunity to rebut a chargeback attempt in the "representment stage."  (*Id.*, 25:14-20.)  If FIA believes that it has been correct in taking the funds back from the merchant, it continues the representment to a "pre-arbitration stage."  (*Id.*, 25:23-26:1.)  If the merchant does not respond to pre-arbitration, the Visa® association rules put it back to FIA to decide whether to

---

[7]  If a cardholder signs a contract that contains terms different from those stated verbally by the merchant, the "contract overrides the verbal promise."  (FIA Dep. 83:9-21.)

withdraw the claim, in which case the merchant "wins," or to proceed to arbitration for a ruling from Visa®.  (*Id.*, 129:11-15.)

16.   If Visa® rules in favor of the cardholder, the credit remains on the cardholder account.  If Visa® rules in favor of the merchant, the merchant gets its money back, and Visa® fines FIA for pursuing a ruling that Visa® maintains FIA should not have pursued.[8]  (*Id.*, 129:23-130:2.)

17.   On June 11, 2010, Mrs. Rigby provided FIA with a copy of a letter from Outrigger to the Rigbys' attorney advising that it had not received their membership application.  (*Id.*, 121:9-25.)  FIA did not contact Outrigger because its letter "doesn't play at all in the chargeback process because the merchant being disputed is Grand Design" and that letter could have come from anyone.  (*Id.*, 122:14-123:9.)

18.   On July 14, 2010, Grand Design refused the chargeback citing, among other things, the fact that (a) the Rigbys signed a contract with a non-cancellation/non-rescission clause, (b) membership activated in the travel services membership club on that day, and (c) the "Customer has never returned our membership kit and it is still in their possession as of today's date."  (Ex. T.)

---

[8] FIA handles approximately 100,000 cardholder disputes a month.  (FIA Dep. 178:12-15, Ex. O.)  Less than five percent of cardholder disputes go to arbitration. (*Id.*, 178:2-8.)

19.    On July 21, 2010,[9] FIA sent Plaintiff a letter stating, among other things, that it was "unable to pursue your dispute(s) further," and that it considered the dispute "resolved."   (Ex. U) (emphasis added.)   FIA also advised that it could not "intervene in situations involving a merchant's return, refund, or cancellation policy." (*Id.*)

20.    On August 3, 2010, more than 60 days after he received his first statement, Plaintiff sent FIA another letter disputing Grand Design's assertion that he had received access to the membership and confirming that his wife had since returned the Kit (after nearly three months) to Grand Design on July 30.  (Ex. I.)   The Rigbys stated that they "simply want the membership price refunded to [them]" and summarized the transaction as "[s]ervices unattainable and *now* no longer desired."   (*Id.*) (emphasis added.)

21.    On August 12, 2010, FIA continued the chargeback process to "Pre-Arbitration,[10] even though it had already confirmed in writing that Plaintiff's

---

[9] The statement period during which Plaintiff first submitted the dispute ran from May 8 to June 8, 2010, and the next two complete billing cycles ran from June 9 to July 9, 2010 and then July 10 to August 7, 2010.   (Exs. V & W.)  Thus under Regulation Z, 12 C.F.R 226.13(c)(2) and (f)(1), FIA timely completed the resolution of Plaintiff's billing dispute.

[10] Throughout the chargeback process, the Rigby claim was circulated several times to a "quality team," "associates that have proven throughout their career that they have a very strong understanding of the dispute process."  (FIA Dep. 58:10-16, Ex. O.)

dispute was resolved.  (Exs. X &Y.)  FIA used the services "not as described" code to describe the nature of the billing dispute, because the Visa® rules did not allow for a code change from "not as described" to having "never received it."  (FIA Dep. 118:24-120:15, Ex. O.)  In its letter of August 12, 2010, FIA also referred to its July 21, 2010 letter, noting that it had already been "unable to determine that a billing error occurred."  (Ex. I.)

22.     Grand Design did not respond to the pre-arbitration claim, so FIA filed for an arbitration ruling directly from Visa®.  (FIA Dep. 129:3-15; 135:4-16, Ex. O.) On October 12, 2010, Visa® issued a ruling in favor of Grand Design (and penalized FIA), stating  specifically:

> The issuer's chargeback for Dispute Reason 53 – Not as Described is invalid. The cardholder's letter attached to the chargeback does not support that the services offered did not match what was received.
>
> *The cardholder had a change of mind and wished to cancel*.

(Ex. Z) (emphasis added.)   Thus, Visa®, not FIA, decided whether Plaintiff ultimately won or lost the dispute in the chargeback process.  (FIA Dep. 130:15-16, Ex. O.)  FIA sent Plaintiff a letter dated November 1, 2010, advising that it was unable to pursue the dispute further. (Ex. FF.)

## D.     THE OCC COMPLAINT

23.     Dissatisfied with the outcome of their dispute, the Rigbys filed an online complaint with the OCC on November 18, 2010.  (Ex. AA.)

24.    FIA responded to the OCC's request for information on November 30, 2010, with a detailed discussion of the steps FIA took to resolve the Rigby billing dispute with Grand Design.  (Ex. BB.)

25.    On January 18, 2011, the OCC sent Plaintiff a letter, stating that its focus was "to determine whether the banks' actions are consistent with banking statutes, regulations or any policies that are applicable to nationally chartered banking institutions."[11]  (Ex. CC.)  The OCC concluded – with no action taken against FIA – that "[a]lthough we understand this matter may not have resulted in your satisfaction, we are pleased that we could be of assistance."  *Id.*

E.    **THE "KIT."**

26.    Outrigger's corporate representative, William Bailey, produced a kit that was "representative" of what was provided by Outrigger to members in 2010.[12] (Deposition of William Bailey ("Outrigger Dep.") 45:11-17, Ex. L; *see also* Ex. F.)

27.    The Kit is a black zip-up, three-ring binder that contains, among other things: (a) two colorful brochures entitled respectively "Outrigger Vacation Club" and "Resort Guide;" for members only; (b) separate directories entitled "Hotel Access," "Golf Access," "Ski Access" and "Recreation Destinations Access"; (c) a

---

[11]  The OCC's regulatory authority over credit card issuers has been since transferred to the Consumer Finance Protection Bureau ("CFPB"), 12 U.S.C. § 5581.

[12]  The Kit produced by Outrigger did not contain any "gifts" that Plaintiff' claim were provided by Grand Design.

calculator; (d) a lined notepad, (e) a Special Request form; and (f) two plastic cards for "Travel Services VIP" and "Premier." (Exs. F, GG & HH.)

28.     The Outrigger Vacation Club brochure is a "directory designed to provide … an overview of your benefits.  Any additional information can be obtained by calling" the toll-free number or accessing the website listed therein.  (Ex. HH at 2.) It provides extensive contact information with additional telephone and fax numbers, email addresses, a website, and hours of operation.   Information is also provided for booking discounted condominiums, hotels, and motels.   In fact, "[t]hese discounts can be obtained by *calling the hotel directly…."*  (*Id.* at 5.)  It explains in detail more facets of the membership and provides a website that can be accessed *without a user name or password* in order to view the "packages…." (*See id.* at 13; Outrigger Dep. 35:6-20; *see also* www.travelservicesdeals.com.)

29.     The Resort Guide is a "sampling" of "properties that are available to members."  (Ex. HH at 17.)

30.     The Travel Services VIP card provides a "complimentary 30 minutes of personal assistance" at www.travelservicesvip.com that gives access to a host of services listed on the card. (*Id.* at 28.)

31.     Bailey testified that even if the Rigbys had not received the user name/password, they still had access to the program's benefits through the toll-free numbers "plastered all over all the documents that are in the kit" as well as the By-

Laws and Membership Application "since they purchased to get quotes right away." (Outrigger Dep. 36:9-39:7, Ex. L.) If members wished to book a trip and Outrigger did not have their paperwork, they could contact the distributor, such as Grand Design, to "find out if they are members and go ahead and work [with] them." (Bailey Dep. 39:7-10; *see also* Declaration of Adrian T. Miller ("Miller Dec.") ¶ 6, Ex. M.)[13] When Grand Design sold the vacation club to Plaintiff and his wife, they had access to membership benefits "immediately." (Outrigger Dep. 35:3-6, Ex. L.)

32.   The Kit does not contain the limitations or fees alleged by Plaintiff. (*See* Exs. F, GG & HH.)

## III.   SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Cook v. United Health Care*, 2010 U.S. Dist. LEXIS 94720, at *5 (M.D. Ala. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1981)).

---

[13] Miller also affirmed that Grand Design's refusal to give a refund was based on the non-cancellation provision. Miller Dec. ¶ 3.

Applying this standard to the facts and evidence before it, this Court should grant summary judgment in favor of FIA and against Plaintiff.

## IV.  ARGUMENT

### A. FIA Is Entitled to Summary Judgment on Plaintiff's FCBA Claim (Count I) Because There Is No Genuine Dispute That FIA Complied With the FCBA.

The FCBA and its implementing regulation, 12 C.F.R. § 226.13 ("Regulation Z"), provide a process for cardholders to dispute credit card charges based on "billing errors" as defined by the FCBA. Under the statute, if a creditor (in this case the card issuer) within 60 days after having transmitted to a cardholder a statement, receives a written notice indicating the cardholder's belief that the statement contains a "billing error," the amount at issue, and the reasons for the cardholder's belief that the statement contains a "billing error," then the card issuer within 30 days is required to send a written acknowledgment of said notice. 15 U.S.C. § 1666(a).   The card issuer is also required to comply with certain resolution procedures within two complete billing cycles (but in no event later than 90 days) both for a "billing error," 12 C.F.R. § 226.13(c), and for no billing error. 12 C.F.R. § 226.13(f).   If there is a "billing error" within the meaning of the statute, the card issuer makes the appropriate correction and credit to the account. 12 C.F.R. § 226.13(e).   If, however, after conducting a "reasonable investigation," the card issuer determines no "billing error" occurred, it is required, within the

prescribed time, to mail or deliver to the cardholder an explanation that sets forth the reasons for the card issuer's belief that the "billing error" alleged by the consumer is incorrect in whole or part.  12 C.F.R. § 226.13(f).

Finally, where a cardholder reasserts the same dispute, "a creditor has no further responsibility . . . if the obligor continues to make substantially the same allegation with respect to such error." 15 U.S.C. § 1666(a).  *See also* 12 C.F.R. § 226.13(h) ("A creditor that has fully complied with these requirements "has no further responsibilities . . . if a consumer reasserts substantially the same billing error.").

As seen below, FIA complied with the FCBA, by timely acknowledging the purported billing error, investigating Plaintiff's dispute (even when reasserted) and, finding no "billing error," timely providing a written explanation.

### 1.    FIA Timely Acknowledged Receipt of Plaintiff's Notice of an Alleged Billing Error.

Plaintiff's May 1, 2010 purchase first appeared in his April 9 to May 7, 2010, account statement.  Plaintiff sent a written notice of his billing dispute[14] in writing on May 28, 2010 (during the first full billing cycle), thereby triggering

---

[14] Plaintiff's purported "billing error" is based on his assertion that his membership was "not accepted or delivered" under Section 1666(b)(3): "A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction."   (*See* Plaintiff's Motion for Partial Summary Judgment, D.E. 70.)

FIA's obligations under the FCBA to acknowledge the notice within 30 days.  *See* 15 U.S.C. §1666(a)(3)(A).  On June 1, 2010, well within the statutory period for response, FIA sent Plaintiff a letter acknowledging receipt of Plaintiff's notice and stating it was researching the dispute and would respond within 30 days.  Thus, FIA timely provided Plaintiff written acknowledgement within 30 days of receiving Plaintiff's notice.

On June 2, 2010, FIA sent Plaintiff a letter stating it had "thoroughly reviewed the details" and on the basis of information it received it was unable to obtain a credit for Plaintiff because FIA "cannot intervene in situations involving a merchant's return, refund or cancellation policy."   FIA also contacted Plaintiff telephonically that day to convey the outcome of the investigation, at which time Plaintiff stated that the Membership benefits varied from those for which he contracted.  This was nothing more than a reassertion of the same dispute -- for the same charge, with the same merchant, for the same product and, as such, FIA had no further responsibility to respond to it. *See Humphrey v. U.S. Bank, N.A.,* 2012 U.S. Dist. LEXIS 120112, **16-17 (N.D. Okla. Aug. 24, 2012) (plaintiff's resubmission of a dispute where "[t]he charge was by the same vendor, for the same amount, for the same service" was a reassertion of the same billing error the bank had already investigated and therefore the bank had no obligation to comply with the FCBA or Regulation Z).

Nevertheless, on June 10, 2010, FIA wrote to Plaintiff and, referring to its earlier correspondence, stated "after completing a reasonable investigation of your dispute based on the information we had at the time, *we were unable to determine that a billing error occurred, and as such your dispute was resolved*."  (Ex. R) (emphasis added.)   Notwithstanding that FIA had no further obligation to investigate under the FCBA, within eight days, FIA acknowledged receipt of the "additional information" and decided to pursue a chargeback, presenting the dispute on Plaintiff's behalf to Grand Design directly.   Thus, to the extent that Plaintiff's June 2 submission is considered a "new" billing error, which it is not, there is no dispute that FIA timely acknowledged receipt of it under the FCBA and Regulation Z.

> **2.     FIA Timely Complied with the Procedural Requirements for the Investigation and Delivery of a Written Explanation That There Was No Billing Error.**

The FCBA required FIA to resolve the purported "billing error" within two complete billing cycles (or no more than 90 days) and to send a written explanation if it found that no "billing error" had occurred.  15 U.S.C. § 1666(a).  The record shows that that FIA timely complied with both of these requirements.

> **a.     First Billing Cycle – FIA Investigates and Explains No Billing Error.**

Indeed, on June 2, 2010, five days after it received Plaintiff's notice of the purported billing error, FIA sent Plaintiff a letter stating it had "thoroughly

reviewed the details" and that on the basis of information provided it was unable to obtain a credit for Plaintiff because FIA "cannot intervene in situations involving a merchant's return, refund or cancellation policy."  Thus, FIA completed its investigation and explained why no billing error occurred within the first billing cycle.

FIA had also contacted Plaintiff telephonically on June 2, 2010 to convey the outcome of its investigation, at which time Plaintiff (or his wife) stated that the Membership services varied from those he had allegedly contracted for.  Eight days later, FIA sent Plaintiff the June 10 letter noting that it had previously completed a reasonable investigation and was *"unable to determine that a billing error occurred, and as such your dispute was resolved."*  (Ex. R) (emphasis added.)  Thus, FIA confirmed it had investigated Plaintiff's dispute and found it not to be a billing error – within the first billing cycle.  There can be no dispute that FIA timely investigated Plaintiff's dispute.

The June 10 letter also explained that FIA had issued a temporary credit to Plaintiff's account, and on that day, FIA attempted the chargeback under the Visa® rules, using the "not as described" code and providing the information as related by Plaintiff.  On July 14, Grand Design declined to refund Plaintiff's money, stating that Plaintiff had signed a non-cancellation clause in the contract, that he had an active membership, and he was in possession of the Kit.

**b.    Second Billing Cycle – FIA (Again) Investigates and Timely Explains No Billing Error**.

On July 21, 2010 (within the second billing cycle), FIA wrote to Plaintiff again, stating that "[w]e have thoroughly reviewed the details of your dispute and based upon the information we received, we are unable to pursue your dispute further.  Unfortunately, we cannot intervene in situations involving a merchant's return, refund or cancellation policy."  (Ex. U.)    Thus, for the second time it investigated the (reasserted) dispute, FIA timely notified Plaintiff of its inability to process the refund and the reasons why the credit would be reversed.

On August 3, 2010, more than 60 days from receiving his first statement Plaintiff wrote to FIA disputing Grand Design's version of the facts. On August 12, 2010, FIA wrote to Plaintiff and, again, referring to its earlier (July 21) correspondence, stated that "after completing a reasonable investigation of your dispute, based upon the information we had at the time, we were unable to determine that a billing error occurred, and as such your dispute was resolved." (Ex. I.)

The record is clear that FIA investigated Plaintiff's dispute, determined that no billing error occurred – within two complete billing cycles – and then communicated in writing the explanations for why there was no billing error. Thus, FIA satisfied its investigation obligations under the FCBA and Regulation Z. *See Pierce v. J.P. Morgan Chase Bank*, 2012 U.S. Dist. LEXIS 118030, *16 (S.D.

Al.  Aug. 21, 2012) (investigation was reasonable where bank looked at contracts with plaintiff and provided explanations regarding interpretation of purported billing error); *Humphrey v. U.S. Bank, N.A.*, 2012 U.S. Dist. LEXIS 120112, *16 (N.D. Okla. Aug. 24, 2012) (holding that bank conducted a reasonable investigation under Section 1666 by providing plaintiff a timely written explanation that it had reached out to the merchant regarding the purported billing error); *Citibank (South Dakota) N.A. v. Jessop*, 2004 WL 3981, *15 (Mont. Dist. Ct. 2004) (reserving ruling on summary judgment but determining that "Citibank complied with the provisions required by federal statute concerning procedure for billing error disputes when it responded in writing on August 21, 2003").

The reasonableness of FIA's investigation is underscored by its timely compliance with the FCBA and Regulation Z, regardless whether Plaintiff disagrees with FIA's conclusions that no billing error occurred.  In *Pierce v. JP Morgan Chase Bank*, this Court granted summary judgment in favor of the creditor on a FCBA claim where a plaintiff disputed the creditor's conclusion that no billing error occurred.   There, the plaintiff had notified her creditor of a purported billing error in the form of an improper allocation of her payments under her home equity line of credit ("HELOC") contract.  2012 U.S. Dist. LEXIS 118030, at *19. In response, the creditor provided two letters to the plaintiff regarding its investigation and with an explanation for the bill, which was grounded in its

review and interpretation of the plaintiff's HELOC contract. *Id.* The Court held that even if the creditor's interpretation of the HELOC contract was incorrect, the fact that the creditor timely reviewed it and responded to the plaintiff with an explanation, established that there was no genuine issue of material fact that it had complied with its obligations under Section 1666. *Id.* at *20. In holding as such, the Court noted that:

> [t]he creditor need only make a reasonable attempt to construe the consumer's complaint, investigate the claim so construed, and report back to the consumer within 90 days as to the merit of this apparent claim. There is, in other words, no penalty for "wrong guesses" made in good faith; the federal statute establishes only the procedural framework for dispute resolution, and does not concern itself with the substantive outcome of this process.

*Id.* (quoting *Burnstein v. Saks Fifth Ave. & Co.*, 208 F. Supp. 2d 765, 775 (E.D. Mich. 2002)).

Thus, to the extent that Plaintiff maintains that FIA's investigation and resolution of his claim was a wrong guess, it does not alter the undisputable conclusion that FIA timely investigated and resolved his purported "billing error."

Finally, the fact that the OCC made no finding of any regulatory irregularity on the part of FIA and took no steps to pursue Plaintiff's dispute with FIA speaks volumes in terms of its regulatory compliance. There is no issue of material fact that FIA timely complied with procedural requirements of the FCBA and it is therefore entitled to summary judgment on Count I.

**B.   FIA Should Be Awarded Summary Judgment on Plaintiff's Negligence Claim (Count III)**

Plaintiff claims that FIA's alleged violation of the FCBA also gives rise to a claim for negligence under Alabama law.[15]   Under the doctrine of negligence *per se*, proof of a statutory violation is proof of negligence only *if* the plaintiff can satisfy *each* of the following four criteria:

> (1) The statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the defendant must have violated the statute; and (4) the defendant's statutory violation must have proximately caused the injury.

*Parker Bldg. Servs. Co. v. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005).   Plaintiff's negligence claim, which is rooted in the doctrine of negligence *per se*, fails because Plaintiff cannot satisfy elements (1), (3) or (4) of the foregoing test.

**1.   Plaintiff Cannot Establish that the FCBA Is Designed to Protect a Class of Persons Which Is Narrower than the General Public.**

First, Plaintiff cannot demonstrate that the FCBA protects a class of persons that is narrower than the consumers, as required to satisfy the first element of the

---

[15] In support of his negligence and wantonness claims, and in opposition to FIA's Motion to Dismiss, Plaintiff argued that Paragraph 23 of the Complaint set forth FIA's duties to conduct a reasonable investigation of Plaintiff's billing dispute, and that Plaintiff's claims for negligence and wantonness incorporated this allegation by reference.  (D.E. 16, p. 10.)  Paragraph 23 simply alleges that FIA "failed to comply with the requirements of the FCBA. . . ."  Based on this alleged violation alone, Plaintiff asserts that FIA breached its duties to Plaintiff, in support of Plaintiff's negligence and wantonness claims.

negligence *per se* doctrine.  "The Alabama Supreme Court has explained that to prevail on a claim of negligence *per se*, a plaintiff must show that the statute allegedly violated protects a class of persons which is narrower than the general public." *Winberry v. UCB, Inc.,* 697 F. Supp. 2d 1279, 1293 (M.D. Ala. 2010) (Albritton, J.) (citing *Parker Bldg.,* 925 So. 2d 927).

Applying this well-settled principle, the United States District Court for the Middle District of Alabama held in *Winberry* that a debt collector's alleged violation of the Fair Credit Debt Collection Practices Act ("FDCPA") does not constitute negligence *per se* and, by extension, does not support a negligence claim that is based on an alleged violation of the FDCPA.  *Id.* at 1293-94.  Accordingly, the *Winberry* court granted summary judgment in favor of defendant on plaintiffs' claims of negligence and negligence *per se*.  *Id.* at 1294.

The court's analysis in *Winberry* is instructive here.  For example, in support of its conclusion, the *Winberry* court recognized that one purpose of the FDCPA is "to protect consumers against debt collection abuses."  *Id.* at 1293 (quoting 15 U.S.C. § 1692(e)).  The court also recognized that the statute defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt."  *Id.* (quoting 15 U.S.C. § 1692a(3)).  In addition, the court noted that the FDCPA creates a private right of action where "any debt collector . . . fails to comply with any provision of this subchapter with respect to any person."  *Id.* (quoting 15

U.S.C. § 1692k).  Holding that the protection of "consumers" was as "expansive" as the general public, the court found that the debt collector was entitled to summary judgment on plaintiffs' claims of negligence *per se* and negligence.[16]

Like the FDCPA, the FCBA is designed "to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601.  Likewise, the regulations applicable to the FCBA broadly define a "consumer" as a "natural person to whom consumer credit is offered or extended."  12 C.F.R. § 226.2.   As with the FDCPA, the enforcement provision applicable to the FCBA states that "any creditor who fails to comply with any requirement imposed under this part, . . . with respect to any person is liable to such person."  15 U.S.C. § 1640.

Based on the foregoing, Plaintiff is a consumer and, thus, cannot demonstrate that the FCBA places him in a more narrow class of persons.  As a result, Plaintiff's negligence claim, which is rooted in the doctrine of negligence *per se*, fails as a matter of law.

## 2.    It Is Undisputed that FIA Fulfilled its Obligations Under the FCBA.

More importantly, FIA is entitled to summary judgment on Plaintiff's negligence claim because Plaintiff cannot demonstrate that FIA violated the

---

[16] Because Plaintiffs' negligence claim was also "founded on the FDCPA statutory duty," the court determined that there was "[n]o distinction . . . between the negligence and negligence *per se* theories."  *Id.* at 1294.

FCBA.  As FIA has already pointed out, there is no genuine dispute that FIA timely complied with the acknowledgment and resolution procedures obligations of the FCBA and Regulation Z.  Accordingly, because Plaintiff cannot demonstrate that FIA violated the FCBA, his negligence claim fails as a matter of law.

### C.    FIA Should Be Awarded Summary Judgment on Plaintiff's Wantonness Claim (Count III)

As with his negligence claim, Plaintiff's wantonness claim is predicated on FIA's alleged violation of the FCBA and it fails for the simple reason that Plaintiff cannot present substantial evidence demonstrating that FIA violated the FCBA. Moreover, even if Plaintiff could demonstrate that FIA violated the FCBA, he has absolutely no evidence demonstrating the heightened level of culpability required to support a wantonness claim.

Wantonness does not simply involve a breach of duty, but "the conscious doing of some act or the omission of some duty while knowing of the existing conditions *and* being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citing *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994) (emphasis in original)).  It is undisputed that not only did FIA comply with the acknowledgment and investigation time frames set forth in the FCBA, but it went beyond its statutory obligations and pursued a refund on behalf of Plaintiff through the chargeback process even after the investigation was closed and its obligations were

satisfied.  This can hardly be characterized as a reckless disregard for Plaintiff's rights without conjuring the notion that "no good deed goes unpunished." Accordingly, FIA is entitled to summary judgment on Plaintiff's wantonness claim.

## V.   CONCLUSION

WHEREFORE, FIA CARD SERVICES, N.A. respectfully requests that the Court enter summary judgment in its favor on all claims asserted against it by Plaintiff.

This the 21st day of June, 2013.

Respectfully submitted,

*s/Kathryn Dietrich Perreault*
John David Collins
Kathryn Dietrich Perreault
Maynard Cooper & Gale PC
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
Telephone:   205-254-1104
Facsimile:   205-714-6404
jcollins@maynardcooper.com
kperreault@maynardcooper.com

and

Kathleen H. Dooley
*Admitted pro hac vice*
Angie H. Zimmern
*Admitted pro hac vice*
McGuireWoods LLP
201 North Tryon Street, Suite 3000 (28202)

Post Office Box 31247
Charlotte, North Carolina 28231
Telephone:   704.343.2000
Facsimile:   704.343.2300
kdooley@mcguirewoods.com
azimmern@mcguirewoods.com

*Attorneys for Defendant FIA Card Services,
N.A.*

## CERTIFICATE OF SERVICE

The undersigned states that a copy of the foregoing was served this date via ECF/PACER:

Kenneth J. Riemer
Underwood & Riemer, P.C.
166 Government Street, Suite 100
Mobile, Alabama 36602

*s/Kathryn Dietrich Perreault*
OF COUNSEL

Dated:  June 21, 2013

48685046_2.DOC