UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES G. RIGBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-2011-373-KD-M** |
| | ) | |
| **FIA CARD SERVICES, N.A., d/b/a** | ) | |
| **BANK OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**DEFENDANT FIA CARD SERVICES, N.A.'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**</u>

Defendant FIA Card Services, N.A. ("FIA"), respectfully submits this Memorandum of Law in Opposition[1] to Plaintiff's motion for partial summary judgment.   For the reasons set forth below, Plaintiff's motion should be denied.

## I.    STATEMENT OF THE CASE

Grounded in innuendo and distortions of fact, Plaintiff's motion grossly mischaracterizes FIA's investigation of Plaintiff's dispute with Grand Design Travel ("Grand Design) over a vacation club membership (the "Membership"). The record shows that FIA timely acknowledged and investigated Plaintiff's claim

---

[1] FIA is also separately submitting its own Motion for Summary Judgment in this case today.

pursuant to the Fair Credit Billing Act, 15 U.S.C. §1666, *et seq*. ("FCBA"), and found it not to be a "billing error," and communicated that fact to Plaintiff in writing – twice.  Moreover, and even though FIA had no further obligations under the FCBA after it resolved Plaintiff's dispute, FIA pursued a refund, known as a "chargeback," for Plaintiff through the Visa® credit card association rules ("Visa® rules") – and took it as far as the Visa® rules permit a cardholder to go.  With his motion for partial summary judgment, however, Plaintiff himself has raised a genuine dispute whether he presented a "billing error" under the FCBA.

Plaintiff's position is fatally flawed because it is premised on "facts" contained in a document that Plaintiff never presented to FIA – or to this Court for that matter: The Outrigger Travel Club ("Outrigger") "Membership Kit" ("Kit") Plaintiff obtained after attending Grand Design's presentation.

Plaintiff would have this Court believe that the Kit disclosed "for the first time" terms and conditions that were not discussed *orally* at the presentation. Noticeably absent from Plaintiff's evidentiary submission, however, is the Kit that forms the basis for his claim that certain limitations and fees never mentioned orally appeared for the "first time" in the Kit.  Plaintiff indisputably retained possession of the Kit for nearly three months but kept no copies of it.  In 2010, Plaintiff never presented FIA with copies of any portions of the Kit, but FIA accepted his assertions of its content at face value and pursued a refund on his

behalf.   Discovery, however, casts strong doubt on those assertions.   Indeed, Outrigger provided a replica of the Kit Plaintiff received in 2010, which, its representative testified, gave Plaintiff "immediate" access to most of the vacation club services and offerings without a user name or password.  This raises a genuine dispute whether Plaintiff did not "accept" the membership and/or did not have access to the services provided by the membership.

Lastly, Plaintiff filed an online complaint with the Office of the Comptroller of the Currency ("OCC"), which is empowered to take supervisory actions against national banks "that do not comply with laws and regulations or that otherwise engage in unsound practices."[2]   Notably, the OCC's investigation of Plaintiff's claim resulted in no finding that FIA failed to comply with laws and regulations or otherwise engaged in unsound practices.

With no evidentiary support, Plaintiff asks this Court to accept as true whatever Plaintiff says is true, including the disputed "facts" listed herein that Plaintiff *never* presented to FIA in 2010.  While such facts may have been accepted as true in the pleadings stage, that cannot be the case in a dispositive motion. With bald assertions utterly devoid of supporting evidence, and the existence of

---

[2] *See* http://www.occ.gov/about/what-we-do/mission/index-about.html (last visited June 21, 2013).

substantial evidence that belies Plaintiff's assertions, Plaintiff's insistence that (a) he presented a billing error, (b) he did not accept the services, and (c) services were not delivered raises genuine disputes of material facts. Plaintiff's motion, therefore, should be denied.

## II. FIA'S STATEMENT OF UNDISPUTED FACTS

### A. THE GRAND DESIGN TRANSACTION.

1. On May 1, 2010, Plaintiff James Rigby and his wife ("the Rigbys"), Mississippi residents, attended a presentation by Grand Design for an Outrigger membership in Gulf Shores, Alabama. (Deposition of Rhonda Rigby ("RR Dep.") 10:23-11:6, 16:3-7, Ex. A.)[3]

2. Plaintiff decided to purchase an Outrigger membership for $4,995.00. (RR Dep. 21:10-24:5, Ex. A.) To complete the purchase, the Rigbys signed and initialed: (1) Acknowledgment and By-laws ("By-Laws") (Ex. B) and (2) Retail Installment Contract. (Ex. C.) Plaintiff also signed a credit card receipt and statement authorizing the $4,995.00 charge for the membership to be placed on his Visa® credit card and agreeing to pay it. (Deposition of James Rigby ("JR Dep.") 33:5-34:8, Ex. D; Ex. E.)

---

[3] For purposes of this Memorandum, all references to "Exhibits" refer to the exhibits attached to FIA's Evidentiary Submission (D.E. 84), unless otherwise indicated.

3.      As to the By-Laws, Plaintiff admits to having "glanced over it very quickly"

and "probably didn't pay attention to every I that was dotted and T that was

crossed." (JR Dep. 13:13-14:20, Ex. D.)   Plaintiff was "sure" he read the Retail

Installment Contract before he signed and initialed it, but did not recall reading the

"Description of Goods and Services" portion of the Retail Installment Contract

which stated:

> **Membership** in a vacation club which includes stays in participating
> condominiums, discounts and other membership benefits as explained
> more fully in the membership kit document.

(*Id*. at 22:4-23:9, Ex. D.)   Plaintiff read the bolded, capitalized and encircled

portion of the Retail Installment Contract that stated:

> **DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT ….
> THIS TRANSACTION IS TAKING PLACE AT OUR MAIN
> OR PERMANENT BRANCH OFFICE OR LOCAL ADDRESS
> AND IS, THEREFORE, NOT SUBJECT TO CANCELLATION
> OR RESCISSION UNDER STATE AND FEDERAL LAW
> ONCE IT IS SIGNED AND RECEIVED BY BUYER.**"

(*Id*. at 24:2-22, Ex. D; Ex. C.)  Mrs. Rigby "didn't really get to look at the contract

a whole lot" but she put her "trust" in Plaintiff to understand its terms.  (RR Dep.

36:2-3, 37:4-5, Ex. A.)

4.      Grand Design provided the Rigbys with copies of the documents they signed

along with the Kit, a black zip-up binder with interior pockets containing "gifts"

from Grand Design and colorful pages along with Outrigger's contact and website

5

information (RR Dep. 50:21-52:3, Ex. A.), as well as detailed information regarding the vacation club services.  (*See* Ex. F.)

5.     The Rigbys reviewed the Kit when they got home and thinking they might have "made a mistake," "they immediately regretted" their decision and decided to "try to get [their] money back,"    (RR Dep. 55:22-53:12, Ex. A; *see also* Ex. G.) The next day, Mrs. Rigby telephoned Grand Design to request cancellation and was instructed to fax a letter to Grand Design and Outrigger.  (RR Dep. 56:19-59:23, Ex. A.) On May 2, 2010, the Rigbys faxed the letter stating:

> Dear Sirs;
>
> Yesterday we attended one of your presentations at Grand Design Travel in Gulf Shores, Alabama.  We were very impressed with the vacation club membership that was offered to us and through that this would be advantageous to us in our future travels and *joined in full*. However, after receiving the package and reviewing the information we realize that although this club would be wonderful for many of our friends and others, it would not be beneficial to us. Several of the fees attached to this program were not covered in the presentation and the full view of what exactly what was included was only revealed in the portfolio after we had purchased the membership so we did not know the limitations and/or inclusions.
> … We have not used the membership and *are not dissatisfied with the promises of this program*; however, the condominium clean up fees and other added charges make this a program that would have to be used more than our lives allow for it to be beneficial to us. Also, most of the packages are only a good buy if you figure airline tickets into the deal and we generally prefer to drive on our vacations and 'see" the sights along the way.  …  Although the savings on hotel stays are beneficial, they are limited as to the cities included – *Mississippi, our home state, has listed only seven*.  Louisiana only has ten. *All in all, the program is great for some people, but is not really a program that we should be invested in for our future*.  We

would appreciate your co-operation in this process and await your response.[4]

(Ex. H) (emphasis added.)

6.    The Rigbys did not return the Kit to Grand Design until July 30, 2010, nearly three months after their purchase.  (RR Dep. 155:3-156:13, Ex. A; *see also* Ex. I.)  They did not make a copy of the Kit's contents.  (RR Dep. 52:1-3, Ex. A.)

**B.    FIA'S TIMELY INVESTIGATION OF PLAINTIFF'S DISPUTE.**

7.    On May 28, 2010, the Rigbys disputed the Grand Design charge in writing to FIA and submitted: (a) a letter from Barton Law Firm to Outrigger; (b) a copy of the Rigby's May 2 letter to Outrigger; (c) the Membership Application; (d) the By-Laws, and (e) the Retail Installment Contract.  (Ex. J.)  Plaintiff's billing dispute was timely presented to FIA during the account statement period of May 8 to June 8, 2010.  (Ex. K.)

8.    On June 1, 2010, FIA sent a letter to Plaintiff, acknowledging receipt of the billing dispute with Grand Design.  (Ex. N.)  After reviewing Plaintiff's dispute and observing that the contract the Rigbys signed contained a non-cancellation provision, FIA determined that it could not credit Plaintiff's account.  (Deposition of Don Robart ("FIA Dep.") 42:16-43:6; 46:6-14, Ex O.)  FIA sent Mr. Rigby a letter dated June 2, 2010, advising that it could not assist him because FIA "cannot

---

[4] Three years later, Plaintiff distances himself from statements about the suitability of the program for others by characterizing it as diplomacy designed to sweeten his chance for a refund, a position he never took in the dispute process.

intervene in situations involving a merchant's return, refund, or cancellation policy." (Ex. P.)  On that date, FIA considered the "dispute resolved" and the balance owed.  *Id.*  The June 2 letter was sent within 30 days of FIA's receipt of Plaintiff's faxed billing dispute on May 28.

9.    On June 2, 2010, FIA also contacted the Rigbys telephonically to explain its decision, whereupon the Rigbys claimed that they were never told they would have to pay booking and usage fees.  At that point, FIA opened a claim file in order to assist the Rigbys with a chargeback under a "not as described" code.  (FIA Dep. 46:15-47:1; 49:15-50:1, Ex. O.)

10.   FIA commenced the chargeback on June 10 and sent Plaintiff a letter that day confirming receipt of the additional information.  (Exs. Q & R.)  In that letter, FIA reminded Plaintiff that *"[a]s stated in our previous letter, after completing a reasonable investigation of your dispute based on the information we had at the time, we were unable to determine that a billing error occurred, and as such, your dispute was resolved*."   (Ex. R) (emphasis added.)   Thus, FIA had already concluded that no billing error had occurred and communicated that decision in writing within 30 days of FIA's receipt of Plaintiff's billing dispute.  FIA also advised that it issued a credit to the account, and explained that if unable to maintain it, the account would be debited "as the merchant(s) has the opportunity to present new information to support why they feel the transaction(s) is valid."

(Ex. R.)   FIA "contacted the merchant(s) on [Plaintiff's] behalf to present [his] dispute(s) to them." (*Id*.)

11.   Under Regulation Z, 12 C.F.R. § 226.13, FIA is not required to make a credibility determination. (FIA Dep. 182:5-25, Ex. O.) Further, under Regulation Z, "everybody met their time frames" for presentation of the dispute by Plaintiff and resolution by FIA.[5] (FIA Dep. 181:6-18, Ex. O.)

## C.   THE VISA® CHARGEBACK PROCESS[6]

12.   FIA's Credit Claims Senior Operations Manager, Don Robart, described the chargeback process and the steps taken to assist Plaintiff in his attempt to procure a refund from Grand Design. (FIA Dep. 62:17-65:19, Ex. O.) FIA is neither judge nor jury in the chargeback process and its role is that of being there "to help the customer along the way." (*Id*., 134:20-135:3.)

13.   Visa® rules govern whether funds that are the subject of a credit card dispute may be removed from a merchant account. (*Id*., 83:4-8.) When a

---

[5] FIA did not contact Grand Design directly before undertaking the chargeback because the merchant has 45 days to respond to it, and if it fails to respond, "the issuer automatically wins" -- so does the cardholder. Alerting the merchant puts the bank at a disadvantage because the merchant will be looking for the chargeback before it processes. Without the alert, there is a chance that the merchant will miss the deadline to respond. Thus, alerting the merchant in certain circumstances can be a disadvantage to the cardholder. (*See* FIA Dep. 174:18-176:5, Ex. O.)

[6] The Visa chargeback cycle is succinctly illustrated at http://usa.visa.com/ download/merchants/chargeback-management-guidelines-for-visa-merchants.pdf at p.12 (last visited June 21, 2013).

cardholder contacts FIA with a dispute in the "first chargeback stage," FIA's Credit Claims group gathers the information provided and determines whether a refund can be processed with the merchant under the Visa® rules. (*Id*., 25:8-12.) If so, the customer's account is credited and the Visa® rules allow the money to be removed from the merchant's account. (*Id*., 25:12-14.)

14.   A chargeback is "coded" with terms used in the Visa ® rules. (*Id*., 47:10-20; 50:3-23; 52:5-20.)   Once a chargeback is processed through a specific code, such as "services not as described," however, the claim cannot continue to be processed later under a different code such as "services not received" especially where, as here, the cardholder was in receipt of something, namely, a Kit, membership application and signed forms. (*Id*., 118:4-120:15.)[7]

15.   The merchant has an opportunity to rebut a chargeback attempt in the "representment stage." (*Id*., 25:14-20.)   If FIA believes that it has been correct in taking the funds back from the merchant, it continues the representment to a "pre-arbitration stage." (*Id*., 25:23-26:1.)   If the merchant does not respond to pre-arbitration, the Visa® association rules put it back to FIA to decide whether to withdraw the claim, in which case the merchant "wins," or to proceed to arbitration for a ruling from Visa®. (*Id*., 129:11-15.)

---

[7]   If a cardholder signs a contract that contains terms different from those stated verbally by the merchant, the "contract overrides the verbal promise." (FIA Dep. 83:9-21.)

16.    If Visa® rules in favor of the cardholder, the credit remains on the cardholder account.  If Visa® rules in favor of the merchant, the merchant gets its money back, and Visa® fines FIA for pursuing a ruling that Visa® maintains FIA should not have pursued.[8]  (*Id*., 129:23-130:2.)

17.    On June 11, 2010, Mrs. Rigby provided FIA with a copy of a letter from Outrigger to the Rigbys' attorney advising that it had not received their membership application.  (*Id*., 121:9-25.)  FIA did not contact Outrigger because its letter "doesn't play at all in the chargeback process because the merchant being disputed is Grand Design" and that letter could have come from anyone.  (*Id*., 122:14-123:9.)

18.    On July 14, 2010, Grand Design refused the chargeback citing, among other things, that (a) the Rigbys signed a contract with a non-cancellation/non-rescission clause, (b) membership activated in the travel services membership club on that day, and  (c) the "Customer has never returned our membership kit and it is still in their possession as of today's date."  (Ex. T.)

19.    On July 21,[9] FIA sent Plaintiff a letter stating, among other things, that it was "unable to pursue your dispute(s) further," and that it considered the dispute

---

[8]    FIA handles approximately 100,000 cardholder disputes a month.  (FIA Dep. 178:12-15, Ex. O.)  Less than five percent of cardholder disputes go to arbitration. (*Id*., 178:2-8.)
[9]    The statement period during which Plaintiff first submitted the dispute ran from May 8 to June 8, 2010, and the next two complete billing cycles ran from June 9 to

"resolved."   (Ex. U) (emphasis added.)   FIA also advised that it could not "intervene in situations involving a merchant's return, refund, or cancellation policy." (*Id*.)

20.   On August 3, 2010, more than 60 days after he received his first statement, Plaintiff sent FIA another letter disputing Grand Design's assertion that he had received access to the membership and confirming that his wife had since returned the Kit (after nearly three months) to Grand Design on July 30.  (Ex. I.)  The Rigbys stated that they "simply want the membership price refunded to [them]," and summarized the transaction as "[s]ervices unattainable and *now* no longer desired."  (*Id*.) (emphasis added.)

21.   On August 12, 2010, FIA continued the chargeback process to "Pre-Arbitration,[10] even though it had already confirmed in writing that Plaintiff's dispute was resolved.  (Exs. X &Y.)  FIA used the services "not as described" code to describe the nature of the billing dispute, because the Visa® rules did not allow for a code change from "not as described" to having "never received it."   (FIA

---

July 9, 2010 and then July 10 to August 7, 2010.  (Exs. V & W.)  Thus under Regulation Z, 12 C.F.R 226.13(c)(2) and (f)(1), FIA timely completed the resolution of Plaintiff's billing dispute.

[10] Throughout the chargeback process, the Rigby claim was circulated several times to a "quality team," "associates that have proven throughout their career that they have a very strong understanding of the dispute process."  (FIA Dep. 58:10-16, Ex. O.)

Dep. 118:24-120:15, Ex. O.)  In its letter of August 12, 2010, FIA also referred to its July 21, 2010 letter, noting that it had already been "unable to determine that a billing error occurred."  (Ex. I.)

22.    Grand Design did not respond to the pre-arbitration claim, so FIA filed for an arbitration ruling directly from Visa®.  (FIA Dep. 129:3-15, 135:4-16 Ex. O.) On October 12, 2010, Visa® issued a ruling in favor of Grand Design (and penalized FIA), stating  specifically:

> The issuer's chargeback for Dispute Reason 53 – Not as Described is invalid. The cardholder's letter attached to the chargeback does not support that the services offered did not match what was received.
>
> *The cardholder had a change of mind and wished to cancel*.

(Ex. Z) (emphasis added.)   Thus, Visa®, not FIA, decided whether Plaintiff ultimately won or lost the dispute in the chargeback process.  (FIA Dep. 130:15-16, Ex. O.)  FIA sent Plaintiff a letter dated November 1, 2010, advising that it was unable to pursue the dispute further. (Ex. FF.)

## D.    THE OCC COMPLAINT

23.    Dissatisfied with the outcome of their dispute, the Rigbys filed an online complaint with the OCC on November 18, 2010.  (Ex. AA.)

24.     FIA responded to the OCC's request for information on November 30, 2010, with a detailed discussion of the steps FIA took to resolve the Rigby billing dispute with Grand Design.  (Ex. BB.)

25.    On January 18, 2011, the OCC sent Plaintiff a letter, stating that its focus was "to determine whether the banks' actions are consistent with banking statutes, regulations or any policies that are applicable to nationally chartered banking institutions."[11]   (Ex. CC.)  The OCC concluded – <u>with no action taken against FIA</u> – that "[a]lthough we understand this matter may not have resulted in your satisfaction, we are pleased that we could be of assistance."  *Id.*

## E.    THE "KIT."

26.    Outrigger's corporate representative, William Bailey, produced a kit that was "representative" of what was provided by Outrigger to members in 2010.[12] (Deposition of William Bailey ("Outrigger Dep.") 45:11-17, Ex. L; *see also* Ex. F.)

27.    The Kit is a black zip-up, three-ring binder that contains, among other things: (a) Two colorful brochures entitled respectively "Outrigger Vacation Club" and "Resort Guide;" for members only" (b) separate directories entitled "Hotel Access," "Golf Access," "Ski Access,"  and "Recreation Destinations Access"; (c) a calculator; (d) a lined notepad, (e) a Special Request form; and (f) two plastic cards for "Travel Services VIP" and "Premier." (Exs. F, GG & HH.)

---

[11]  The OCC's regulatory authority over credit card issuers has been since transferred to the Consumer Finance Protection Bureau ("CFPB"), 12 U.S.C. § 5581.

[12]  The Kit produced by Outrigger did not contain any "gifts" that Plaintiffs claim were provided by Grand Design.

28.     The Outrigger Vacation Club brochure is a "directory designed to provide …
an overview of your benefits.  Any additional information can be obtained by
calling" the toll-free number or accessing the website listed therein.  (Ex. HH at 2.)
It provides extensive contact information with additional telephone and fax
numbers, email addresses, a website, and hours of operation.   Information is also
provided for booking discounted condominiums, hotels, and motels.   In fact,
"[t]hese discounts can be obtained by *calling the hotel directly…."* (*Id.* at 5.)  It
explains in detail more facets of the membership and provides a website that can
be accessed *without a user name or password* in order to view the "packages…."
(*See id.* at 13; Outrigger Dep. 35:6-20; *see also* www.travelservicesdeals.com.)

29.     The Resort Guide is a "sampling" of "properties that are available to
members."  (Ex. HH at 17.)

30.     The Travel Services VIP card provides a "complimentary 30 minutes of
personal assistance" at www.travelservicesvip.com that gives access to a host of
services listed on the card. (*Id.* at 28.)

31.     Bailey testified that even if the Rigbys had not received the user
name/password, they still had access to the program's benefits through the toll-free
numbers "plastered all over all the documents that are in the kit" as well as the By-
Laws and Membership Application "since they purchased to get quotes right
away."  (Outrigger Dep. 36:9-39:7, Ex. L.)  If members wished to book a trip and

Outrigger did not have their paperwork, they could contact the distributor, such as Grand Design, to "find out if they are members and go ahead and work [with] them."  (Bailey Dep. 39:7-10; *see also* Declaration of Adrian T. Miller ("Miller Dec.") ¶ 6, Ex. M.)[13]  When Grand Design sold the vacation club to Plaintiff and his wife, they had access to membership benefits "immediately."  (Outrigger Dep. 35:3-6, Ex. L.)

32.  The Kit does not contain limitations or fees alleged by Plaintiff.  (*See* Exs. F, GG & HH.)

## III.   STATEMENT OF <u>DISPUTED</u> FACTS[14]

1.   FIA disputes all of Plaintiff's purported "Statements of Undisputed Facts" regarding oral statements allegedly made to Plaintiff and his wife during and after the Grand Design presentation.  Plaintiff has produced no documents or testimony to corroborate his version of the events.

2.   Except where otherwise stipulated in FIA's Statement of Undisputed Facts, FIA disputes all of Plaintiff's purported "Statements of Undisputed Facts" relating

---

[13] Miller also affirmed that Grand Design's refusal to give a refund was based on the non-cancellation provision.  (Miller Dec. ¶ 3.)

[14] Plaintiff's Brief does not contain any Determinations of Undisputed Fact and Conclusions of Law, appropriately designated, stated in separately numbered paragraphs with all findings of fact appropriately referenced to the supporting document or documents filed in the action or in support of the motion as required by Local Rule 7.2(a), making it difficult for FIA to "point out the disputed facts appropriately referenced to the supporting document or documents filed in the action." Local Rule 7.2(b).

to the alleged contents of the Kit. Specifically, FIA disputes the following in Plaintiff's brief:

a.      The Kit "*explained, for the first time, that in order to get the discounts on travel, members had to first book the trip and pay the full price*."  [Docket Entry ("D.E.") 70 at 3.]

Rebuttal: At no time during the dispute process did Plaintiff provide this information to FIA so this "fact" should be disregarded.  (*See also* Ex. B, signed before Plaintiff was given the Kit), ¶18 ("I/We understand that all rebates, if applicable, will be sent to us 30-90 days after travel.") and ¶ 22 ("Any rebate that you may receive will take up to 30-90 days to process after you have traveled & will automatically be mailed to your address on file.") (*See also* Ex. GG at 5 – "NOTICE: No rebates are offered on already discounted hotels.")

b.      The Kit "*further explained that once a trip was booked, it could not be cancelled for any reason*."  [D.E. 70 at 3.]

Rebuttal:  At no time during the dispute process did Plaintiff present this information so it should be disregarded.  Also, this information was disclosed in writing before Plaintiff received the Kit.  (*See* Ex. B, ¶ 25: "Certain airlines, cruise lines, hotels, resorts and other properties do not allow Outrigger Vacation Club to make refunds for cancelations. All condo confirmations are final and non-refundable.") (*See also id.* at ¶ 3: "if…for any reason any refund I may be entitled

17

to is limited to the actual amount I paid for that confirmation if cancelation policy permits.")   (C*ompare* Ex. GG at 14, entitled "Disclosures": "***CANCELLATIONS/CHANGES***   Various fees are assessed by carrier lines, hotels, and other suppliers for any change or cancellation. …You are instructed to read or inquire about these terms and penalties once you received confirmation of your reservations….")

c.      The Kit "*explained that family benefits were only available to immediate family and, even then, the immediate family member had to use the member's credit card – the same credit card used to purchase the membership – for all expenses that were incurred as part of the trip.  So in order to allow an immediate family member to use the benefit, the family member would have to take Mr. Rigby's credit card with them[sic].*"  *Id.*  [D.E. 70 at 3.]

Rebuttal: Plaintiff did not give this information to FIA so it should also be disregarded.  (*See also generally* Ex. F, GG & HH, which says nothing of the sort.)[15]

---

[15]  A more credible version of this "fact" was disclosed in writing before Plaintiff received the Kit.  (*See* Ex. B at ¶ 1: "It is company policy that all travel reservations must be authorized and signed off on by the member before booking any trip."; *id.* at ¶ 15: "All reservations must be made by member only.") (*See also* Outrigger Dep. 51:19-52:23; 55:15-56:3, Ex. L, noting that Outrigger takes multiple credit cards from family members.)

d.     The Kit for the first time "*explained that there was only a handful of hotels listed that were eligible and none in the Rigby's [unspecified] area. None of this was explained during the presentation.*"   [D.E. 70 at 4.]

   Rebuttal:  This conflicts directly with the Rigbys' May 2, 2010, letter to Outrigger which states that there were seven hotels in Mississippi (where Plaintiff resides) and ten in Louisiana.  (Ex. H.)  Thus, this "fact" should be disregarded. (*See also* Ex. GG at 15, "Special Request Form":  "This form is provided to assist you with special requests for inventory not found on our website.") The statement is also belied by the Kit's "Hotel Access" directory which lists 26 hotels in Mississippi and 15 hotels in Louisiana.  (See Ex. HH.)

e.     "*In its discussions with Mrs. Rigby, FIA suggested that she return the "kit" to Grand Designs.*"  [D.E. 70 at 9.]

   Rebuttal:  This is a bald assertion that is not supported anywhere in the record.  (*See, e.g*., Ex. DD.)

   3.  Except where otherwise stipulated in FIA's Statement of Undisputed Facts, FIA disputes all of Plaintiff's purported "Statements of Undisputed Facts" relating to Plaintiff's characterization of (a) "FIA's Dispute Process,"  (b) "FIA's Initial Review and Denial of the Rigby Dispute,"  (c) "FIA Reconsiders,"  (d) "FIA Reverses Its Decision,"  (e) "FIA Reverses Its Decision (Again), (f) "FIA Reverses (Again),"  (g) "And Again – for Its Final Denial" and (h) "Scope of FIA's

Investigation." *Id.* [D.E. 70 at 5-12.]  FIA timely responded to, investigated, and resolved Plaintiff's billing dispute with the conclusion that it was not a "billing error."  Moreover, FIA did not ultimately "decide" the outcome of Plaintiff's dispute with Grand Design in the chargeback process.[16]

## IV.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  When a court considers a motion for summary judgment, "it views all of the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party."  *SEC v. Calvo,* 378 F.3d 1211, 1214 (11th Cir. 2004) (citation omitted).  Thus, the court must "avoid weighing conflicting evidence or making credibility determinations." *Hilburn v. Murata Elecs. N. Am. Inc.,* 181 F.3d 1220, 1225 (11th Cir. 1999) (citation omitted).

The party seeking summary judgment bears the initial burden of identifying "those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes shows an absence of any genuine issue of material

---

[16] Plaintiff's attempt to make an issue of the fact that non-legal personnel handling the millions of disputes each year have not performed any legal research as to the validity of a merchant's refund policies should be rejected outright for two reasons: Plaintiff cites to no legal authority that (a) compels a card issuer to do so or (b) holds, in Alabama, that a non-cancellation/non-rescission policy for a vacation club purchase is against the law.

fact." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). An issue of fact is "material" if "it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit." *Snipes v. Northeast Pharms.,* 2013 U.S. Dist. LEXIS 26701, at *12 (M.D. Ala. Feb. 27, 2013) (citation omitted).   An issue of fact is "genuine" if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*   A factual issue is only genuine if it has a "real basis in the record." *Lloyd v. Tassell,* 318 Fed. Appx. 755, 757 (11th Cir. 2009) (citation omitted).

Only if the court determines that the moving party has met its burden does the burden shift to the non-moving party "to establish, by going beyond the pleadings, that there exist genuine issues of material facts." *Hairston,* 9 F.3d at 918.  If the non-moving party presents evidence "such that a reasonable jury could return a verdict for [that] party," then summary judgment is not appropriate. *Maldonado v. Snead,* 168 Fed. Appx. 373, 378 (11th Cir. 2006) (citation omitted). In other words, "[w]here a reasonable fact finder may draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Hardy v. Ala. Dep't of Indus. Relations,* 2013 U.S. Dist. LEXIS 45154, at *3 (M.D. Ala. Mar. 29, 2013); *see also Mize v. Jefferson City Bd. Of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996)

("Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.").   Applying this standard to the facts before it, this Court should deny Plaintiff's motion for partial summary judgment.

## V.     ARGUMENT

### A.     PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE IS A GENUINE DISPUTE WHETHER PLAINTIFF PRESENTED A "BILLING ERROR."

Plaintiff's motion is grounded in the mistaken premise that he timely submitted to FIA a "billing error" under the FCBA.  A "billing error" is defined as: "A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction." 15 U.S.C. § 1666(b)(3).

When the Court views all of the evidence and all inferences drawn therefrom in the light most favorable to FIA, there is no doubt that Plaintiff's FCBA claim is fraught with genuine issues of material fact as to whether Plaintiff presented a "billing error."   Indeed, there are factual issues surrounding whether (a) the vacation club services were "not accepted" by Plaintiff and (b) the services were "not delivered."  Given the conflicting versions of what Plaintiff had and did not have during the claim resolution process, summary judgment should be denied

22

because this Court cannot "avoid weighing conflicting evidence or making credibility determinations." *Hilburn v. Murata Elecs. N. Am. Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999).

For this Court to rule that FIA violated the FCBA's duty to investigate Plaintiff must prove, as a threshold matter, find that Plaintiff presented a "billing error."  For the reasons set forth below, this Plaintiff cannot do.

### (i) There is a Genuine Issue of Material Fact As To Plaintiff's Purported Non-Acceptance of the Outrigger Membership.

Placing undue weight on the United States Court of Appeals' reference to the Alabama commercial code's definition of "acceptance,"[17] Plaintiff glosses over the fact that his arguments of non-conformity and non-acceptance of the membership are premised entirely upon his bald and uncorroborated assertions that the Membership Services, as set forth in the Kit, did not conform to oral promises allegedly made during the Grand Design presentation.

Plaintiff maintains that the membership did not conform to what was orally presented *before* he signed the contract.  Plaintiff, however, has presented no proof of what was described at the presentation, so it is difficult, if not impossible, to discern any basis for a purported non-conformity.  If anything, whether or how the

---

[17] *See* D.E. 70 at 15 (citing *Rigby v. FIA Card Services, N.A.*, 490 Fed. Appx. 230, 234 (11th Cir. 2012)).

membership benefits stated in the Kit conformed to the oral presentation presents a genuine issue of material fact.

Plaintiff argues that Alabama's commercial code gives him the "right to reject goods whose quality do not conform to the contract." (*See* D.E. 70 at 15 (citing Ala. Code §§ 7-2-601 & 602 (1975)). This is interesting, but it does not work. The "contract" in this case consists of the Retail Installment Contract and the accompanying By-Laws, which were signed and initialed by Plaintiff before he obtained the Kit. Notably, Plaintiff only "glanced over" the two-page By-Laws (which his wife "trusted" him to read), which would explain why he and his wife expressed surprise when they finally read them at home and saw "the full view of what exactly was included." This does not, however, establish non-conformity to the contract; if anything, it establishes just the opposite: The membership benefits conformed to the contract Plaintiff signed.[18]

At the time he presented his dispute in writing, Plaintiff presented a mere handful of issues he had with the membership: (1) fees not covered in the presentation; (2) condominium clean-up fees; (3) packages that are only good with airline tickets in the deal; (4) no desire to take multiple cruises; and (5) limited

---

[18] That there were "no oral or written promises, representations, agreements or warranties between Outrigger Vacation Club and me or the distributor's sales representative and me" (Ex. B, ¶ 12) also undermines Plaintiff's insistence that the travel club benefits did not conform to the oral presentation.

hotel selection.   (*See* Ex. H.)   Based on the documentation and information Plaintiff provided, FIA twice determined that there was no billing error and told him so.

Similarly unavailing is Plaintiff's argument that rescission is allowed when the assent was induced by fraud.  This presupposes that fraud has been proven here, which is has not, because Plaintiff has not asked this Court to adjudicate any fraud claim and, moreover, he cannot because Grand Design is not a party to this lawsuit.  Thus, Plaintiff ought not to be permitted to rely on any fraud-based theory for rescission in this case.[19]

Plaintiff "accepted" the membership when he signed the contract and received the Kit, so there can be no billing error grounded in "non-acceptance." *See Greisz v. Household Bank*, 8 F. Supp. 2d 1031 (N.D. Ill. 1998) (no billing error alleged where consumer signed a contract to purchase a heating unit and services and soon thereafter complained about the quality of service).  That he attempted to cancel the transaction the next day does not alter the fact that he had access to membership benefits for the next three months.  These facts raise a genuine issue of material fact whether the benefits conformed to the "contract" as well as

---

[19] In reality, none of Plaintiff's "facts" about how the contents of the Kit failed to confirm to oral promises can ever be proven in this case without this Court making determinations of credibility as between and among Plaintiff and his wife, the unidentified Grand Design presenters, and Outrigger.  This alone compels denial of Plaintiff's motion for partial summary judgment.

whether Plaintiff, in keeping the Kit and reviewing the benefits, did not accept them such that his dispute can be characterized as a "billing error."

### (i)   There is a Genuine Dispute Whether Services Provided by the Outrigger Membership Were Delivered.

The record undercuts any argument that there is an undisputed billing error grounded in non-delivery.  Access to the Internet reservation system was just one component of the membership, and there were myriad ways to access the benefits of membership, such as complimentary concierge services, direct hotel bookings and a website that displayed various vacation packages without a user name or password.  Thus, contrary to what Plaintiff would have this Court believe, the user name and password was *not* the only way to access membership benefits.  It is undisputed that Plaintiff had possession of the Kit for nearly 90 days, so he had access to most of the Membership services.[20]

---

[20] To the extent that Plaintiff claims that his return of the Kit three months after his purchase constitutes a new billing error, this argument fails for two fundamental reasons.  First, this purported "billing error" was submitted on August 3, more than 60 days after FIA sent the first account statement and therefore FIA had no obligation to investigate it.  *See Dawkins v. Sears Roebuck & Co*., 109 F.3d 241, 243 (5th Cir. 1997), as revised by 1997 U.S. App. LEXIS 12696, at *5 (5th Cir. Apr. 8, 1997) (affirming summary judgment of Section 1666 claim because the cardholder did not provide the card issuer notice within 60 days of receiving the first statement containing the alleged error); *see also Langenfeld v. Chase Bank USA, N.A*., 537 F. Supp. 2d 1181, 1203 (N.D. Okla. 2008) (granting summary judgment for same reason).  Second, the August 3 notice is nothing more than a "reassertion" of Plaintiff's same billing dispute, which FIA had already investigated. *See* 12 C.F.R. § 226.13(h) ("A creditor that has fully complied with the requirements of this section has no further responsibilities under this section...if

This set of facts is nearly indistinguishable from the set presented in in *Binder v. Bank of America Corp.*, 2010 U.S. Dist. LEXIS 124208, **12-13 (N.D. Tex. Nov. 22, 2010) where the plaintiff bought a travel club membership and claimed that the terms were misrepresented at the time of purchase. There, the Court declined to find a billing error under Section 1666(b)(3) based upon plaintiff's allegations that the membership was not delivered in accordance with the agreement made at the time of the transaction. *Id.* Noting that "the FCBA, its implementing regulations, and Official Staff Interpretations focus on what might be considered clerical errors - the debtor was billed the wrong amount, billed for items he did not purchase, billed for items he refused or did not receive, or the creditor made some type of computational error or did not mail a statement," the Court declined to adopt a "more expansive interpretation" of billing error. *Id.* at *14. Because the facts here strongly suggest that Plaintiff received Membership services with the Kit, his motion raises a genuine dispute as to whether he presented a billing error. If anything, the record strongly suggests he did not.

---

a consumer reasserts substantially the same billing error"); *see also Humphrey v. U.S. Bank, N.A.,* 2012 U.S. Dist. LEXIS 120112, **16-17 (N.D. Okla. Aug. 24, 2012) (plaintiff's resubmission of a dispute where "[t]he charge was by the same vendor, for the same amount, for the same service" was a reassertion of the same billing error the bank had already investigated and therefore the bank did not have to comply with the FCBA or Regulation Z).

**2.      Plaintiff's Motion for Summary Judgment Should Also Be Denied Because FIA Complied With The FCBA.**

Even if this Court were to determine that Plaintiff had presented a billing error, Plaintiff is not entitled to summary judgment because there is no issue of material fact that FIA complied with the all of the procedural requirements of Section 1666.  As set forth in more detail in FIA's motion for summary judgment, FIA timely acknowledged Plaintiff's notice, investigated his claim, and provided him with a written explanation of why it was not a billing error.

The FCBA, and its implementing regulation, 12 C.F.R. §226.13 ("Regulation Z"), provide a process for cardholders to dispute credit card charges based on "billing errors."  If a creditor, within 60 days after having transmitted to a cardholder a statement, receives a written notice indicating the cardholder's belief that the statement contains a "billing error," the amount at issue, and the reasons for the cardholder's belief that the statement contains a "billing error," then the card issuer must, within 30 days, send a written acknowledgment of said notice. 15 U.S.C. § 1666(a).  In addition, not later than two complete billing cycles after receipt of the notice, the card issuer must make appropriate corrections or send a written explanation of the reasons why it believes the cardholder's account to be correctly shown.  *Id*. The card issuer is also required to comply with resolution procedures set forth therein within two complete billing cycles (but in no event later than 90 days) after receiving a "billing error" notice. 12 C.F.R. § 226.13(c).

28

If, after conducting a "reasonable investigation," the creditor determines no "billing error" occurred, it is required, within the prescribed time, to mail or deliver to the cardholder an explanation that sets forth the reasons for the card issuer's belief that the "billing error" alleged by the consumer is incorrect in whole or part. 12 C.F.R. § 226.13(f).

## VI.    CONCLUSION

WHEREFORE, FIA CARD SERVICES, N.A., respectfully requests that the Court deny Plaintiff's motion for partial summary judgment in its entirety.

This, the 21st day of June, 2013.

Respectfully submitted,

*s/Kathryn Dietrich Perreault*
John David Collins
Kathryn Dietrich Perreault
Maynard Cooper & Gale PC
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
Telephone:  205-254-1104
Facsimile:   205-714-6404
jcollins@maynardcooper.com
kperreault@maynardcooper.com

and

Kathleen H. Dooley
*Admitted pro hac vice*
Angie H. Zimmern
*Admitted pro hac vice*
McGuireWoods LLP
201 North Tryon Street, Suite 3000 (28202)

Post Office Box 31247
Charlotte, North Carolina 28231
Telephone:  704.343.2000
Facsimile:   704.343.2300
kdooley@mcguirewoods.com
azimmern@mcguirewoods.com

*Attorneys for Defendant FIA Card Services,
N.A.*

## CERTIFICATE OF SERVICE

The undersigned states that a copy of the foregoing was served this date via ECF/PACER:

Kenneth J. Riemer
Underwood & Riemer, P.C.
166 Government Street, Suite 100
Mobile, Alabama 36602

*s/Kathryn Dietrich Perreault*
OF COUNSEL

Dated:  June 21, 2013

48443161_5.DOC