IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JAMES G. RIGBY, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| vs. | )    CV-2011-373-KD-M |
| | ) |
| FIA CARD SERVICES, N.A., d/b/a | ) |
| BANK OF AMERICA | ) |
|    Defendant. | ) |

---

**REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**INTRODUCTION AND SUMMARY**

The only facts material to Rigby's Motion for Partial Summary Judgment concern FIA's actions leading up to its final decision in November 1, 2010 to deny Rigby's dispute, the information available to FIA at that time and the basis of that decision. There is no dispute as to the relevant facts. Rigby timely submitted his billing error dispute in late May 2010. In June and July 2010, FIA collected information from Rigby and Grand Designs in the course of its investigation. That information included the June 4th letter from Outrigger which unambiguously stated that the Rigbys were unable to use their membership. In August 2010, after review of information from both Rigby and Grand Designs, FIA determined that Rigby had not received the services he paid for and had effectively cancelled the contract. Although FIA initially credited the account after reaching that determination, as required; it reversed that decision based solely on the fact VISA ruled against it in the arbitration of the dispute between FIA and Grand Designs.

FIA's response does not challenge any of the relevant key facts. Instead, it attempts to create

the impression of a factual dispute with "evidence" which its attorneys have developed since the filing of this case. None of this "evidence" was not pursued or considered at the time FIA denied Rigby's dispute. Because FIA's liability under the FCBA is determined by the actions it took during its investigation, evidence which played no part in its investigation or final decision is not material.

The FIA's own records and its own witness confirms that FIA denied the dispute without making any determination that the services were actually received. In fact, it concluded the opposite. The FCBA and Reg. Z clearly prohibit such a denial and required that FIA credit Rigby's account, once it determined that Rigby correctly asserted a "billing error."

## ARGUMENT

A.  **FIA's Duty Under the FCBA**

The applicable requirements of the FCBA and Reg. Z are well defined and have been clearly articulated as part of law of this case. Rigby v. FIA Card Servs., N.A., 490 F. App'x 230, 234-35 (11th Cir. 2012). The FCBA allows a consumer, within 60 days of receiving a credit card statement, to submit a written statement of his "***belief*** that . . . that the statement contains a billing error." 15 U.S.C. § 1666(a)(2)(emphasis added). Once notice of an alleged "billing error" is received "the creditor must investigate the matter, either correcting the billing error or sending a written explanation of why the original statement was correct." Rigby v. FIA Card Servs., N.A., 490 F. App'x 230, 234-35 (11th Cir. 2012), *citing* 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(c), (e), (f). If the creditor, as FIA did here, determines that "a billing error occurred as asserted," then it must permanently "credit the consumer's account" and take other corrective actions. 12 C.F.R. § 226.13(e). Even if the billing error confirmed by the creditor differs from the one initially alleged by the consumer, the creditor must correct the error. 12 C.F.R. § 226.13(f). Also, FIA may not deny

2

a dispute concerning the alleged non-delivery unless it "conducts a reasonable investigation and determines that the property or services were actually delivered, mailed, or sent as agreed." 12 C.F.R. 226 Official Commentary, § 226.13(f)(3)(ii)(emphasis added); see also Rigby, 490 F. App'x at 235.  Finally, the creditor must conclude its investigation within two billing cycles after receipt of the dispute or ninety-days, whichever is shorter. 15 U.S.C. § 1666(a).

      FIA's response does not address these requirements head-on. Instead, it attempts to side-step them by challenging Rigby's initial claim with "evidence" developed after this suit was filed and years after its final denial of Rigby's claim.  This includes the testimony of Outrigger's representative solicited, for the first time, by FIA's attorneys during discovery.  FIA never attempted to contact outrigger while it was conducting its investigation or prior to its final denial. (Robart Depo., (Ex. 6), pp. 154-156).  Therefore, even if the Outrigger testimony is assumed to be credible, this "evidence" is not material to the FCBA claim because it was not pursued, received or considered by FIA during its FCBA investigation, was not a basis for the decision to deny Rigby's claim.  Therefore, it has no bearing on whether FIA conducted a "reasonable investigation" prior to denying Rigby's claim.        Regarding its legal duty, FIA makes only general statements regarding it's perceived duty in resolving a factual dispute between the customer and merchant.  FIA states that it is not "required to make a credibility determination" and that it is "neither judge nor jury in the chargeback process and its role is that of being there 'to help the customer along the way.'" (Doc. 86, p. 9).  FIA's only authority for these statements is its own 30(b)(6) witness' lay opinion.  There is no legal basis for these statements and they can not be reconciled with the plain language of FCBA and Reg. Z. The statute and regulation unambiguously require the creditor to conduct a reasonable investigation of the dispute and prior to a denial, determine whether the goods or services were

timely delivered. Rigby, 490 F. App'x at 235. Moreover, the undisputed facts demonstrate that FIA did make a "credibility" decision when it determined that Rigby "has not been able to use the membership" and that Grand Designs' response failed to address "the true nature of the disputes." (FIA Transactions Notes (Ex. 7), pp. 324-26). At the time that determination was made (September 2010), a credit had been issued. Once that determination was made, FIA was prohibited from reversing the credit as it did in November.

The other aspect of FIA's response is its reliance on the contractual arrangement between itself, the merchant and VISA as cover for its failure to comply with the FCBA. FIA goes to great lengths to describe the VISA arbitration process concerning disputes between FIA and its merchants. FIA suggests that it has no FCBA liability because VISA ultimately ruled against it in its dispute with Grand Designs. The arbitration rules FIA describes are the product of its contractual relationship with VISA and the merchant. Those rules stand separate from the FCBA requirements. FIA is the only entity regulated by the FCBA and FIA cites no authority for its position that as long it complies with its contractual agreement with VISA, it can not be liable under the FCBA. The FCBA on credit card issuers are not qualified or limited by the internal dispute process contractually established between it and its merchants. It is axiomatic that contractual arrangements or obligations can not alter or limit statutory requirements. Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 223-24 (1986)("[i]f the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions"). Moreover, nothing in the FCBA or Reg. Z allows a creditor to abrogate its duty to investigate by delegating to VISA the authority to render a final decision. No authority is cited by FIA and the undersigned could find no reported case which even discusses such an argument.

**B.      The Facts Material to FIA's FCBA Liability are Undisputed**

FIA's liability under the FCBA depends entirely on the adequacy of its investigation of Rigby's dispute. FIA's response focuses on challenging Rigby's position through testimony elicited only after this suit was filed and well after FIA concluded its investigation. It is undisputed that FIA never attempted to contact Grand Designs or Outrigger while it was investigating Rigby's dispute. (Robart Depo., (Ex. 6), pp. 152-156). None of this "evidence" was considered or even pursued by FIA at the time it was conducting its investigation.

As to what happened during FIA's investigation of the Rigby billing error dispute, there is no material disagreement. In fact, the steps FIA took prior to ultimately rejecting Rigby's claim and the determinations made by FIA are well documented by FIA's own records and were confirmed by FIA's witness. The parties do not disagree as to these basic facts. Each of the key facts material to FIA's investigation and ultimate refusal to credit Rigby's account are addressed below.

**1.      That Rigby Timely Submitted an Alleged Billing Error;**

Timeliness of the Rigby's billing error notice is not disputed. (See FIA Response (Doc. 86, p. 9)("Under Regulation Z, 'everybody met their time frames' for presentation of the dispute by Plaintiff and resolution by FIA."[1] This is confirmed by FIA's representative witness who stated that FIA never considered Rigby's dispute untimely". (Robart Depo., (Ex. 6), p. 172).

**2.      That Rigby's Alleged Billing Error Included the Claim That the Services They Paid for Were Not Timely Delivered;**

FIA does not dispute that Rigby's billing error dispute included the claim that the services

---

[1] In a footnote, FIA suggests that the information regarding the failure to deliver services was not timely provided. That information was delivered to FIA well within the 60-day period. This is addressed in below.

5

were not timely received. FIA, therefore, was prohibited from denying the dispute without making a determination that the "property or services were actually delivered." Rigby, 490 F. App'x at 235. As explained in detail in Rigby's initial brief, FIA admits that no such determination was made. (See Doc. 70, Section "K," p. 10). In fact, FIA's records show that it ultimately agreed with Rigby that services were not delivered as promised. (FIA Transactions Notes (Ex. 7), pp. 324-26).

Although FIA's response is peppered with unsupported statements by counsel "disputing" specific facts, no specific relevant evidence is cited which creates a factual dispute. These statements do not create a question of fact. Ellis v. England, 432 F.3d 1321, 1326 (11th Cir.2005)

There is no dispute that on June 9, 2010, Rigby faxed to FIA the June 4th letter Outrigger explaining that it would be impossible for the Rigbys to access the membership benefits. (Exhibit 10). This is well-beyond the 14-day delivery period stated in the contract. There is also no dispute that this information was entered into its system and reviewed by FIA on June 14th. (Robart Depo., (Ex. 6), pp. 70- 71, 121). FIA's records also show that Mrs. Rigby called FIA on June 11th and provided the updated information regarding the denial of benefits. (FIA Transactions Notes (Ex. 7), pp. 345-346).[2]

### 3. That FIA Never Made a Determination That the Services Had Been Received, But, Instead, Determined That Rigby Had Not Timely Received the Benefits.

---

[2]. FIA suggests in a footnote that the submission of this information was untimely because it was also conveyed in letter from Rigby on August 3rd. (Doc. 86, n.20, pp. 26-27). This ignores the undisputed fact that the Outrigger letter was faxed to FIA on June 11th and reviewed as part of Rigby's dispute. Moreover, FIA's witness confirmed that FIA did not consider any aspect of Rigby's dispute to be untimely. (Robart Depo., (Ex. 6), p. 172). To the extent that FIA's footnote is considered an argument, it should be disregarded because it is contradicted by the admissions of its own witness and the admission made in its factual statements.

In investigating a billing dispute that includes the claim that goods or services were not timely delivered, "the creditor shall not deny the assertion unless it conducts a reasonable investigation and determines that the property or services were actually delivered, mailed, or sent as agreed." 12 C.F.R. 226 Official Commentary, § 226.13(f)(3)(ii)(emphasis added); see also Rigby, 490 F. App'x at 235.

As stated in the initial brief, FIA's witness admits that no determination was made that Rigby actually received the services for which he was charged. (Robart Depo., (Ex. 6), pp. 154-156). FIA attempts to fog the issue by stating that it does not make "credibility" decisions, but it fails to explain what bearing this could have on its obligation to determine that goods or services were provided before denying a claim. To clear up any possible confusion, here is the testimony cited in Rigby's main brief:

> Q. Well, the Rigbys provided information that indicates, including the letter from Outrigger, that they didn't have access to the benefits.
>
> A. Sure.
>
> Q. All right? So she provides information that indicates that they have not been able to use these benefits. Has FIA done anything to confirm that they, in fact, could have used those benefits that she's talking about in her letter?
>
> THE WITNESS: Are you asking is there something we can do outside the chargeback process?
>
> Q. Well, as far as what you did in response to information provided. Did you do anything to confirm that she actually was provided the access code and username that would allow her to use the system's services?
>
> THE WITNESS: I'm not sure I know how to answer that. I'm trying to -- bear with me -- I'm trying to read between the lines. I'm just having a tough time.
>
> Q. Well, we know you reviewed the information provided by the merchant, right?

A. Well, we reviewed the information first provided by the customer.

Q. Right. And then the merchant. And part of that information was that, no, they have been able to use this from day one, right?

A. Or they have access to it as of today.

Q. Right. Did FIA take any other action, other than reviewing the information from the customer that we talked about and reviewing the merchant's statement that they have been able to use the services from day one, to determine whether they actually did get access to the services?

THE WITNESS: And I will fall back to outside the chargeback process, and having those open lines of communication, was there any other actions we took outside of that, I would say no.

Q. Okay. Didn't call the merchant to say, Hey, provide us proof that they can use this? Didn't contact the merchant directly after you received the merchant's statement that they can use the services?

A. Which merchant?

Q. Well, the only merchant – you said the only merchant is Grand Design.

A. Right, but they aren't the ones that can show access, right?

Q. Well, I don't know. I don't think you know. I don't think anybody knows. But all I'm asking is did anybody at FIA pick up the phone or

Q. . . .But all I'm asking is did anybody at FIA pick up the phone or send an e-mail or otherwise communicate with the merchants and ask them about their statement, ask them to provide proof that what they're saying is correct?

THE WITNESS: No.

Q. Okay. And I'm only asking what FIA did.

A. All right.

Q. Okay. Did FIA ever contact Outrigger directly and ask for proof one way or the other whether the Rigbys can use their services that they paid for?

THE WITNESS: No.

8

> Q. Other than contacting VISA through the dispute process you've described, did FIA contact any other entity in an effort to determine whether the Rigbys can use the services they paid for?
>
> THE WITNESS: No. Can I clarify my response to that?
>
> MR. RIEMER: Sure.
>
> THE WITNESS: Is the customer an entity?
>
> MR. RIEMER: Well, yes.
>
> Q. So did you contact the customer to verify one way or the other if they were able to use the services they paid for?
>
> A. So I would say yes to that and that's why we made decisions to move forward.
>
> Q. And you contacted them and she provided that long letter that we looked at?
>
> A. Yes.
>
> Q. The August letter?
>
> A. August 3rd, yes.
>
> Q. Okay.  Then you get the decision adverse to the Rigbys from Visa, and then you send this November 1st letter [final denial letter].
>
>     *    *    *
> A. Yes.

(Robart Depo., (Ex. 6), pp. 152-157).

There is no factual dispute on this point. FIA did not reach a determination that the benefits were actually received. In fact, after receiving Grand Designs' response and Rigby's rebuttal (but before the VISA arbitration), FIA determined that a billing error had occurred. Here is the determination, as explained in FIA's internal notes:

> Customer cancel [sic] the travel services due to non reduced service rate, no membership card received, the "kit" was returned to rep at merchant location,

9

> customer has not been able to use the membership. . . merchant rebuttal only addressed the cancellation policy does not address the true nature of the disputes.

(FIA Transactions Notes (Ex. 7), pp. 324-26). This is the position which FIA submitted to VISA in the arbitration. (Robart Depo., (Ex. 6), pp. 139-141). This was the final conclusion reached by FIA. No further research was conducted after this point. FIA simply waited for the VISA ruling and sent its final denial letter after VISA ruled in favor of the merchant. (Exhibit 19).

Reg. Z sets out clearly required FIA to "correct the billing error and credit" the account as soon as this determination was made. 12 C.F.R. § 226.13(c)(1). This is the case, even if the billing error discovered varies from the one alleged in the consumer's initial dispute. 12 C.F.R. § 226.13(f)(3). It is undisputed that FIA had already issued the credit at the time of this determination, but then reversed it, without any further determination and based solely on VISA's arbitration rule.

### C. FIA's Argument Regarding the Binder Case

FIA argues that this Court should adopt the reasoning set out in Binder v. Bank of Am. Corp., 3:10-CV-770-B, 2010 WL 5017314 (N.D. Tex. Nov. 22, 2010). This was precisely the argument FIA advanced at the Motion to Dismiss stage and which was adopted by the Magistrate Judge's Recommendation adopted by this Court. (See Doc.s 30 and 33). This same argument was squarely rejected by the Eleventh Circuit on appeal. Rigby v. FIA Card Servs., N.A., 490 F. App'x at 235-36.

As the Rigby appellate decision explains, Binder is distinguishable on its facts. The Binders never argued that they did not receive or "accept" the services. In fact, they made two monthly payments on the agreement before they attempted to cancel. The Binders alleged only that the FCBA applied to their dispute because "services were not delivered in accordance with the agreement made

10

at the time of the transaction." This was specifically noted in the <u>Binder</u> opinion:

> Here, the Binders do not dispute that they received a travel club membership and that they were charged the agreed purchase price of $5,593.00, nor do they argue that BOA made a computational error. Rather, they argue that the "characteristics" and "real price" of the travel club were misrepresented to them at the time of purchase.

<u>Binder</u>, 2010 WL 5017314, slip op., p. 3.  Thus, the <u>Binder</u> court found that the dispute concerned the quality of services accepted and received and, therefore, not a "billing error."  <u>Id.</u>

In contrast, Rigby claims to have neither accepted nor timely received the benefits for which he paid.  It was on this basis that the Eleventh Circuit declined to follow <u>Binder</u>.

> [T]his case differs from <u>Binder v. Bank of America Corp.</u>, No. 3:10–CV–770–B, 2010 WL 5017314 (N.D.Tex. Nov. 22, 2010), which the magistrate judge found "instructive." But, as the magistrate judge here pointed out, "the plaintiffs in *Binder* did not dispute that they received the travel club membership.... [w]hile Plaintiff [Rigby] in this case disputes whether he received the travel club membership, or at least its benefits." This distinction is significant. In fact, the Binder court specifically noted that its interpretation of § 1666(b)(3) "would not preclude finding a billing error under subsection (b)(3) where the plaintiff was charged for goods or services he refused or never received." *Binder,* 2010 WL 5017314, at *3 n. 9. By alleging that he did not accept the membership, and alternatively that the membership was never delivered, Rigby has pleaded facts constituting a "billing error" under 15 U.S.C. § 1666(b)(3).

<u>Rigby v. FIA Card Servs., N.A.</u>, 490 F. App'x 230, 235-36 (11th Cir. 2012).

The law of the case doctrine forecloses legal arguments resolved by a prior appellate decision in the same case.  That doctrine seeks to avoid waste of judicial resources on the re-adjudication of previously resolved issues.  <u>Venn v. St. Paul Fire & Marine Ins. Co.</u>, 99 F.3d 1058, 1063 (11th Cir. 1996); <u>Wheeler v. City of Pleasant Grove</u>, 746 F.2d 1437, 1440 (11th Cir.1984).  FIA advances the same argument rejected by <u>Rigby</u>, without referencing that opinion or arguing why the Court should entertain it, notwithstanding the law of the case doctrine.  This should be rejected for the reasons set out in <u>Rigby</u> and because that decision is the law of this case.

**CONCLUSION**

Because FIA's Response fails to establish any dispute of material fact as to its liability under the FCBA and because its non-compliance with that statute is clearly established by undisputed facts, Rigby is entitled to a judgment as a matter of law on Count One of his Complaint.

    \s\Kenneth J. Riemer
KENNETH J. RIEMER
Attorney for Plaintiff
UNDERWOOD & RIEMER, PC
166 Government Street
Mobile, AL 36602
(251) 432-9212
(251) 990-5558 (fax)
kjr@alaconsumerlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel of record. A copy has also been e-mailed to counsel of record.

    \s\Kenneth J. Riemer
KENNETH J. RIEMER